876 A.2d 692

**Glenn L. ROSS**

v.

**STATE BOARD OF ELECTIONS, et al.**

**No. 131, Sept. Term, 2004.**

Court of Appeals of Maryland.

June 23, 2005.

ment. We have considered the memorandum and concluded that it does not affect our disposition of this matter.

650

J. Carroll Holzer (Holzer & Lee, Towson), on brief, for Appellant/Cross–Appellee.

Richard D. Rosenthal (Mark D. Dopkin, Tydings & Rosenberg LLP, Baltimore), on brief, Michael D. Berman, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Judith A. Armold and William R. Varga, Asst. Attys. Gen., Baltimore), all on brief for Appellees/Cross–Appellants.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, Judge.

This matter arises out of the 2004 General Election for the Thirteenth Councilmanic District seat on the Baltimore City Council in which Paula Johnson Branch was the Democratic Party candidate and victor in the election, and Glenn L. Ross was the Green Party candidate and individual who, after the election, challenged Branch's qualifications to be on the ballot. We are presented with the question of the applicability of

Maryland Code (2002), Sections 9–209 [1] and 12–202 [2] of the Election Law Article, which provide for judicial challenges to aspects of the election process. The Circuit Court for Baltimore City granted the Motion for Summary Judgment filed by the Respondents, the State Board of Elections and Ms. Branch, based on Petitioner Ross's failure to comply with the time limitations of Section 9–209 of the Election Law Article. We find that the Circuit Court erroneously relied upon Section 9–209 as it does not govern challenges to a candidate's qualifications to appear on the ballot. Because Ross's petition was untimely and thus, as a matter of law, barred by laches, we will uphold the Circuit Court's entry of summary judgment.

---

1. Section 9–209 of the Election Law Article provides:

(a) *Timing.*—Within 3 days after the content and arrangement of the ballot are placed on public display under § 9–207 of this subtitle, a registered voter may seek judicial review of the content and arrangement, or to correct any other error, by filing a sworn petition with the circuit court for the county.

(b) *Relief that may be granted.*—The circuit court may require the local board to:

(1) correct an error;

(2) show cause why an error should not be corrected; or

(3) take any other action required to provide appropriate relief.

(c) *Errors discovered after printing.*—If an error is discovered after the ballots have been printed, and the local board fails to correct the error, a registered voter may seek judicial review not later than the second Monday preceding the election.

2. Section 12–202 of the Election Law Article provides:

(a) *In general.*—If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the elections has been held, on the grounds of an act or omission:

(1) is inconsistent with this article or other law applicable to the elections process; and

(2) may change or has changed the outcome of the election.

(b) *Place and time of filing.*—A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:

(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or

(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified.

## Background

### Facts

The undisputed material facts of this case are as follows. Ms. Paula Johnson Branch filed a certificate of candidacy to run in the election for the Thirteenth Councilmanic District in Baltimore City on June 30, 2003, and in September of 2003, she won the Democratic Primary Election.[3] Throughout 2003 and 2004, two campaign finance entities[4] raising funds for Branch's campaign repeatedly failed to file the campaign finance reports required under Section 13–304 of the Election Law Article[5] and received Show Cause notices from the State Board for these oversights.

---

**3.** Baltimore City held its primary for the Councilmanic District in 2003 and the General Election in 2004 in an effort to conform to the schedule for national and state elections to increase voter turn out. *See Resolution 99–016*, Baltimore City Charter, Art. III, § 2 (ratified November 2, 1999).

**4.** "Campaign finance entity" is defined in Section 13–202(b) of the Election Law Article as:
 (1) Subject to paragraph (2) of this subsection, an individual may not file a certificate of candidacy until the individual establishes, or causes to be established, a campaign entity.
 (2) The campaign finance entity required by paragraph (1) of this subsection may be either:
 (i) a personal treasurer; or
 (ii) a political committee that is an authorized candidate campaign committee.
 Branch's campaign finance entities were named "Advisory Committee to Re-Elect Paula Johnson Branch" and "Supporters of Paula Johnson Branch."

**5.** Section 13–304 of the Election Law Article provides:
 (a) *Requirement.*—From the date of its organization until its termination under the provisions of this title, a campaign finance entity, except a political club, shall file a campaign finance report at the times, for the periods, and at the locations required by §§ 13–309, 13–312, and 13–315 of this subtitle.
 (b) *Content.*—A campaign finance report filed by a campaign finance entity under subsection (a) of this section shall include the information required by the State Board with respect to all contributions received and all expenditures made by or on behalf of the campaign finance entity during the designated reporting period.
 (c) *Continuing requirement for candidates.*—A campaign finance report prescribed by this subtitle for the campaign finance entity of a candidate is required whether or not:
 (1) the candidate files a certificate of candidacy;
 (2) the candidate withdraws, declines a nomination, or otherwise ceases to be a candidate;

On October 13, 2004, the Baltimore Sun ran an article titled, "Welch Critics Seeking to Remove Veteran Councilwoman From Ballot; Son Pleaded Guilty in June to Filing False Finance Reports," which mentioned that a committee supporting Branch was delinquent in its filings and that Ross, as the Green Party candidate, was raising it as an issue in the campaign. Laura Vozzella, *Welch Critics Seeking to Remove Veteran Councilwoman From Ballot; Son Pleaded Guilty in June to Filing False Finance Reports,* BALT. SUN, Oct. 13, 2004, at 1B. On October 22, 2004, Ross's campaign contacted the State Board via e-mail and requested that the Board discuss at its next meeting on October 26th, Branch's disqualification under Section 13–332 of the Election Law Article [6] for the failure of the two campaign finance entities to comply with the reporting requirements of the Campaign Finance Title of the Election Law Article.

On October 26, 2004, the State Board considered the request that Branch be disqualified from being a candidate, but declined to rule. Mr. Giles W. Burger, Chairman of the State Board of Elections, stated:

> I'm not going to make any statements that should somehow jeopardize the candidacies for next week. And if that disappoints the petitioners, I'm sorry about that, but I think that that is the right decision.

> \* \* \*

> I want to thank you for coming, and as my colleagues said, we are interested in this issue. We'll take it up later. My

---

(3) the candidate's name appears on the primary ballot; or

(4) the candidate is successful in the election.

Md.Code (2002), § 13–304 of the Election Law Article.

**6.** Section 13–332 of the Election Law Article provides:

An individual may not become a candidate for any public or party office in this State or become a treasurer for a campaign finance entity if, as to any campaign finance report due under § 13–304 of this subtitle from, or on behalf of, that individual during the preceding five calendar years:

(1) there exists a failure to file as specified in § 13–327 of this subtitle; or

(2) the individual has failed to pay a late fee that is due.

Md.Code (2002), § 13–332 of the Election Law Article.

only suggestion is to petition the General Assembly, perhaps take this up in the courts. But we are going to let stand the candidacies for the moment for this election.

Branch remained on the ballot and won the General Election on November 2, 2004 with 79.79% of the vote as compared to Ross's 12.22% of the vote. On November 5, 2004, Ross filed a petition for "Immediate Injunctive Relief and Declaratory Judgment Under Maryland Election Law and Request for Hearing" in the Circuit Court for Baltimore City. Specifically, Ross requested that the court enjoin the Baltimore City Board of Canvassers from certifying Branch as the victor in the election for Baltimore City Council for the Thirteenth Councilmanic District, that the court declare Branch ineligible to be a candidate for office and the election for the Thirteenth Councilmanic District void, and require that a new election be held.

### Procedural History

While awaiting the ruling on his petition, Ross filed a Motion for Summary Judgment on December 3, 2004. The State Board filed its Motion to Dismiss or, in the Alternative, Summary Judgment, and Branch did so as well. On December 7, 2004, a trial judge denied Ross's petition. Ross immediately filed a second motion for temporary restraining order requesting that the Circuit Court enjoin Branch's swearing in, which the same trial judge also denied. On December, 9, 2004, Branch took the oath of office.

Prior to the Circuit Court ruling on his original Motion for Summary Judgment, Ross filed another Motion for Summary Judgment and Memorandum in Support Thereof. Branch and the State Board responded, and a hearing was set for January 10, 2005 before another judge of the Circuit Court.

At the hearing, Ross submitted on his memorandum. The judge then heard argument from the State Board and Branch concerning Sections 9–209 and 12–202 of the Election Law Article and the application of laches. The State Board argued that Ross's claim was barred under both Section 9–209 and Section 12–202 of the Election Law Article because he failed

to satisfy either of the time periods set forth in those statutes. The Board asserted that Ross should have filed his petition on September 27th, rather than on November 5th, for it to have been timely under Section 9–209. Moreover, the State Board contended that Ross did not file his claim on a timely basis under Section 12–202 of the Election Law Article because he filed twenty-eight days after he first became aware of the alleged wrongdoing on October 13th, which was well beyond the ten-day period stipulated in Section 12–202.

Similarly, Branch argued that Ross's action was barred by the doctrine of laches because he failed to pursue his claim prior to the election and caused prejudice to her by waiting until after the election occurred. Moreover, Branch asserted that by failing to seek judicial redress prior to the election, Ross undermined the free election process and that laches properly should bar his claim. On January 19, 2005, the Circuit Court granted summary judgment in favor of all defendants and against Ross for failing to comply with Section 9–209 of the Election Law Article.

On January 24, 2005, Ross filed a Notice of Appeal in the Circuit Court, pursuant to Maryland Code (2002), Section 12–203(a) of the Election Law Article, which provides that "an appeal shall be taken directly to the Court of Appeals within 5 days of the date of the decision of the circuit court." This Court treated Ross's Notice of Appeal as a petition for writ of certiorari, and on February 3, 2005, we issued the writ, *Ross v. Maryland State Board of Elections*, 385 Md. 161, 867 A.2d 1062 (2005). Because Ross did not present questions to consider in his Notice of Appeal, we shall consider the questions enumerated by the State Board and Branch in their joint cross-petition for writ of certiorari:

1. Did the circuit court correctly determine that Ross's complaint could and should have been brought under Section 9–209 of the Election Law Article, thereby precluding any claim under Section 12–202, and that it was untimely under Section 9–209?

2. Assuming arguendo that the judicial review remedy of Section 9–209 was not a "timely and adequate remedy"

available to Ross, did Ross's complaint satisfy the requirement of Section 12–202(b) that it be filed within 10 days after the act or omission complained of or the date the action or omission became known to Ross?

3. Even if Ross's complaint was timely under Section 12–202(b) of the Election Law Article, should summary judgment have been granted in Respondents' favor because there is no private cause of action to enforce the campaign finance reporting requirements of Title 13 of the Election Law Article?

4. Assuming that a private party can invoke the sanctions established in Part VII of Title 13, Subtitle 3 of the Election Law Article, should summary judgment have been granted in Respondents' favor because those sanctions were either moot or inapplicable?

5. In light of Baltimore City Charter, Article III, § 10(d), and before any determination of the Baltimore City Council in the matter, did the circuit court have jurisdiction to determine the election and qualifications of a member of the City Council?

We find that the Circuit Court erred in granting summary judgment in favor of Respondents based upon Section 9–209 of the Election Law Article. Nevertheless, because: Ross's claim remains untimely under the doctrine of laches as a matter of law; there are no disputes of material fact bearing on that issue; and there is no basis upon which the court could have legitimately denied summary judgment on that issue, which was properly raised by Respondents, we shall uphold the grant of summary judgment in favor of Respondents.[7]

### Standard of Review

■■■■ This Court reviews an order granting summary judgment *de novo.* *O'Connor v. Baltimore County,* 382 Md.

---

7. Because we find that Ross's claim is barred as a matter of law by the common law doctrine of laches, we will not address questions three through five.

102, 110, 854 A.2d 1191, 1196 (2004); *Todd v. MTA,* 373 Md. 149, 154, 816 A.2d 930, 933 (2003); *Beyer v. Morgan State Univ.,* 369 Md. 335, 359, 800 A.2d 707, 721 (2002); *Schmerling v. Injured Workers' Ins. Fund,* 368 Md. 434, 443, 795 A.2d 715, 720 (2002); *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194, 199 (2001). If no material facts are disputed, we must determine whether the Circuit Court correctly granted summary judgment as a matter of law. *See* Md. Rule 2–501(e); *O'Connor,* 382 Md. at 111, 854 A.2d at 1197; *Todd,* 373 Md. at 155, 816 A.2d at 933; *Beyer,* 369 Md. at 360, 800 A.2d at 721; *Schmerling,* 368 Md. at 443, 795 A.2d at 720. "In appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment." *Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003), quoting *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 729 (2001), quoting in turn *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029, 1036 (2001). Where, however, two grounds are so interrelated that they cannot be properly considered as separate and distinct, the appellate court is not so constrained. *Eid,* 373 Md. at 10, 816 A.2d at 849.

## Discussion

Ross argues that because of Branch's finance committees' failure to file all but one of the required campaign finance reports during a two-year period, Branch was ineligible to be a candidate and should have been disqualified. Moreover, Ross asserts that he is entitled to seek Branch's removal from the Baltimore City Council through judicial means under Section 12–202 of the Election Law Article. He claims that the State Board's failure to take action to eliminate Branch from the ballot materially affected the outcome of the election, and as such, he is entitled to judicial review. Ross further contends that he filed his petition within the ten-day period stated in Section 12–202 because it was filed on the tenth day after the State Board meeting on October 26th, and that because the statute does not require the claim to be filed prior

to the occurrence of the election, even if the act or omission occurred before the election, his claim is timely.

Ross also argues that because the grounds for disqualification arose after the expiration of the three-day time period for challenges under Section 9–209, it would be nonsensical to interpret the statute to divest the State Board of its power to disqualify candidates for wrongdoing that occurred between the expiration of the three-day period, in this case September 27, 2004, and the election. Moreover, Ross asserts that if Section 9–209 of the Election Law Article in fact governed his action and precluded his seeking judicial relief, the State Board would have raised this concern during the October 26th meeting when Branch's qualifications were addressed. Because it was not, Ross characterizes Respondents' arguments arising out of Section 9–209 as creative lawyering that results in an absurd outcome that frustrates the purpose of enabling registered voters to turn to the courts for relief from wrongdoing in an election. He contends that Section 12–202 provides for judicial review of a candidate's eligibility independent of a challenge to the "content and arrangement of the ballot" under Section 9–209.

The State Board asserts that the Circuit Court properly granted summary judgment based upon Section 9–209. It argues that Section 9–209 provides a timely and adequate remedy to challenge the appearance of a candidate's name on the ballot, and as such, Section 12–202 does not provide an alternate means of obtaining judicial relief. Furthermore, the State Board suggests that a specific remedy such as that created in Section 9–209 becomes "untimely" simply because a registered voter who might have pursued a claim under that provision fails to do so.

The State Board also argues that, regardless of the section of the Election Code that Ross bases his action upon, his action is untimely. Moreover, the State Board contends that Ross cannot justify his delay in filing suit until after the election. It asserts that an e-mail and comments at a State Board meeting, without a formal complaint made to the Board,

do not give rise to "an act or omission" that may be reviewed within the framework of Section 12–202. The State Board further argues that Section 13–332 of the Election Law Article only prohibits an individual from "becoming a candidate" under Section 5–301, and that it no longer applies once that individual is accepted as a candidate in the election. Regardless of the interpretation of Section 13–332, the State asserts that it does not provide for a private cause of action through which a private citizen may seek to have a candidate precluded from participating in the election.

Respondents also argue that Ross's action is untimely under the common law doctrine of laches. They contend that, due to the prejudice inflicted upon the voters of the Thirteenth Councilmanic District by instituting an action after the election, which could have been brought prior to it, election day should be the deadline for filing such an action under Section 12–202 of the Election Law Article. Respondents assert that Ross cannot justify his delay in pursuing his claim, and as such, it should be barred by the doctrine of laches.

 For the purposes of determining whether the Circuit Court properly interpreted Section 9–209 of the Election Law Article as precluding Ross's ability to prevail as a matter of law, we must explore the statute's scope and meaning. This Court has often stated that our goal in interpreting statutes is to "identify and effectuate the legislative intent underlying the statute(s) at issue." *Serio v. Baltimore County*, 384 Md. 373, 390, 863 A.2d 952, 962 (2004), (quoting *Drew v. First Guaranty Mortgage Corp.*, 379 Md. 318, 327, 842 A.2d 1, 6 (2003), in turn quoting *Derry v. State*, 358 Md. 325, 335, 748 A.2d 478, 483 (2000)); *Pete v. State*, 384 Md. 47, 57–58, 862 A.2d 419, 425 (2004); *Graves v. State*, 364 Md. 329, 346, 772 A.2d 1225, 1235 (2001). As we have consistently stated, the best source of legislative intent is the statute's plain language, and when the language is clear and unambiguous, our inquiry ordinarily ends there. *Serio*, 384 Md. at 373, 863 A.2d at 962; *Pete*, 384 Md. at 57–58, 862 A.2d at 425; *Drew*, 379 Md. at 327, 842 A.2d at 6; *Beyer v. Morgan State Univ.*, 369 Md. 335, 349, 800 A.2d

707, 715 (2002); *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347, 1350 (1995). When interpreting the language of a statute, "we assign the words their ordinary and natural meaning." *Serio,* 384 Md. at 373, 863 A.2d at 962; *Pete,* 384 Md. at 57–58, 862 A.2d at 425; *O'Connor v. Baltimore County,* 382 Md. 102, 114, 854 A.2d 1191, 1198 (2004); *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998). We will "neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Serio,* 384 Md. at 373, 863 A.2d at 962; *Pete,* 384 Md. at 57–58, 862 A.2d at 425; *O'Connor,* 382 Md. at 114, 854 A.2d at 1198 (quoting *Taylor v. NationsBank,* 365 Md. 166, 181, 776 A.2d 645, 654 (2001)). Thus, the provisions must be read in "a commonsensical perspective to avoid a farfetched interpretation." *Serio,* 384 Md. at 373, 863 A.2d at 962; *Graves v. State,* 364 Md. 329, 346, 772 A.2d 1225, 1235 (2001); *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994); *Dickerson v. State,* 324 Md. 163, 171, 596 A.2d 648, 652 (1991). Only when the language is not clear and unambiguous will we turn to the other provisions of the statutory scheme, considering the "purpose, aim, or policy of the enacting body." *Serio,* 384 Md. at 373, 863 A.2d at 962; *Pete,* 384 Md. at 57–58, 862 A.2d at 425; *Drew,* 379 Md. at 327, 842 A.2d at 6; *Beyer,* 369 Md. at 350, 800 A.2d at 715; *In re Mark M.,* 365 Md. 687, 711, 782 A.2d 332, 346 (2001)(quoting *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992)).

The ability of registered voters to seek judicial redress for errors on a ballot long has been a component of the statutory scheme governing elections in Maryland. In 1896, the General Assembly enacted Article 33, Section 49 to the Code, which provided in pertinent part:

It shall be the duty of the Board of Supervisors of Elections of each county and of the City of Baltimore to provide ballots for every election for public officers held under this Article in which any voters within the county or said city shall participate, and to cause to be printed on the ballot the name of every candidate whose name has been certified to

or filed with the proper officers in the manner herein provided for; but the said Supervisors shall not be required to print any name upon a ballot if the same shall not have been certified to them at least six days before election day. Each ballot shall also contain a statement of every constitutional amendment or other question to be submitted to the vote of the people at any election. Ballots other than those printed by the respective Boards of Supervisors of Elections, according to the provisions of this Article, shall not be cast or counted in any election, except as hereinafter provided. Nothing in this Article contained shall prevent any voter from writing on his ballot and marking in the proper place the name of any person other than those already printed for whom he may desire to vote for any office, and such votes shall be counted the same as if the name of such person had been printed upon the ballot and marked by the voter. Any voter may take with him into the polling place any printed or written memorandum or paper to assist him in marking or preparing his ballot, except a facsimile of the ballot to be voted. Ballots shall be printed and in possession of the Supervisors of Elections at least four days before election day, and shall be subject to the inspection of the candidates and their agents. If any mistake be discovered, it shall be the duty of said Supervisors to correct the same without delay, and if said Supervisors shall decline or refuse to make correction, then upon the sworn petition of any qualified voter who would have the right to vote for such candidate at the approaching election, the Circuit Court for any county or one of the Judges of the Supreme Bench of Baltimore City may, by order, require said Supervisors of Elections to correct such error or to show cause why such error should not be corrected.

1896 Md. Laws Chap. 202 § 49, codified as Md.Code (1896), Art. 33 § 49. This Section, providing for a private cause of action to correct errors contained on a ballot after inaction by the Board of Election Supervisors, remained substantively unchanged until 1986. *See* Md.Code (1924), Art. 33 § 62; Md.Code (1939), Art. 33 § 97; Md.Code (1951), Art. 33 § 68;

Md.Code (1957), Art. 33 § 93(e); Md.Code (1957, 1971 Repl. Vol.), Art. 33 § 16–4(c); Md.Code (1957, 1977 Repl.Vol., 1983 Cum.Supp.), Art. 33 § 16–4(c) (deleting reference to Baltimore Supreme Bench).

In 1986, the General Assembly, in House Bill 193, repealed Article 33, Section 16–4(c) and enacted the language currently contained in Section 9–209 of the Election Law Article as Article 33, Section 16–4(f)(4)(i). 1986 Md. Laws, Chap. 422. Article 33, Section 16–4(f)(4)(i) provided in pertinent part:

(1) Judicial relief from the arrangement and contents prepared by the Board or to correct any other error discernible at that time may be sought, within 2 days of the expiration of the 3–day period, upon the sworn petition of any registered voter filed with the circuit court for any county.

(2) The court may require the Board:

(A) to correct an error;

(B) to show cause why an error should not be corrected; or

(C) to take any other action to provide any other relief deemed by the court to be appropriate and consistent with this article.

Md.Code (1986), § 9–209 of the Election Law Article. This change in the language is the only substantive alteration in the ability to seek judicial relief from errors contained on the ballot itself in the history of the statute; with the change, a registered voter was no longer required to inform the Board of error on the ballot and allow it to correct the mistake prior to seeking judicial relief.

In 1998, the General Assembly renumbered Article 33, Section 16–4(f)(4)(i) as Article 33, Section 9–209 and shortened the time period within which a registered voter could seek judicial relief from ballot errors from five days after the ballot was first displayed to the public to three days. 1998 Md. Laws, Chap. 585 § 2. In 2002, Article 33, Section 9–209 was recodified without substantive change as Section 9–209 of the Election Law Article. 2002 Md. Laws, Chap. 291 § 4. Section 9–209 of the Election Law Article currently provides:

(a) *Timing.*—Within 3 days after the content and arrange-
ment of the ballot are placed on public display under § 9–
207 of this subtitle, a registered voter may seek judicial
review of the content and arrangement, or to correct any
other error, by filing a sworn petition with the circuit court
for the county.

(b) *Relief that may be granted.*—The circuit court may
require the local board to:

 (1) correct an error;

 (2) show cause why an error should not be corrected; or

 (3) take any other action required to provide appropriate
relief.

(c) *Errors discovered after printing.*—If an error is discov-
ered after the ballots have been printed, and the local board
fails to correct the error, a registered voter may seek
judicial review not later than the second Monday preceding
the election.

Md.Code (2002), § 9–209 of the Election Law Article. The
errors subject to judicial review under Section 9–209, whether
arising from the content and arrangement of the ballot or
other facial aspects of the ballot, are confined to the various
characteristics of the ballot, not the qualifications or lack
thereof of the candidates.

■■ Because Section 9–209 of the Election Law Article
provides for judicial relief for errors in the "content and
arrangement" of the ballot, we must determine whether the
failure to file required campaign finance reports by a commit-
tee is properly categorized as "content" or "arrangement."
Sections 9–206, 9–210, and 9–211 specify "arrangement" as
consisting of the general format of the ballot, the order of
offices, candidates' names, the placement of party designations
and county of residence if applicable, and the order of ques-
tions as they appear on the ballot. Md.Code (2002), §§ 9–206,
9–210, 9–211 of the Election Law Article. It appears from the
plain language of the applicable statutes that "arrangement"
refers solely to the appearance and order of the information
contained on the ballot and does not embrace a candidate's

eligibility. Therefore, we turn our attention to whether a candidate's purported ineligibility to participate in the election may properly be considered a challenge to the "content" of the ballot within the context of Section 9–209.

Section 9–205 of the Election Law Article delineates what is considered the "content" of the ballot and provides:

Each ballot shall contain:

(1) a heading as provided in § 9–206(a) of this subtitle;

(2) a statement of each question that has met all of the qualifications to appear on the ballot;

(3) the title of each office to be voted on;

(4) the name, as specified in the certificate of candidacy, or as otherwise provided in Title 5 of this article, of each candidate who has been certified by the State Board;

(5) a party designation for certain candidates as provided in this subtitle;

(6) a means by which a voter may cast write-in votes, as provided in this subtitle; and

(7) instructions to voters as provided in this subtitle.

Md.Code (2002), § 9–205 of the Election Law Article. The only possible category of "content" that the basis of the present challenge conceivably could be classified as is Section 9–205(4): "the name, as specified in the certificate of candidacy, or as otherwise provided in Title 5 of this article, of each candidate who has been certified by the State Board." Md. Code (2002), § 9–205(4) of the Election Law Article. There is no dispute, however, that at the time of her inclusion on the ballot, Branch's eligibility had been certified by the State Board. Therefore, it would appear that the inclusion of Branch's name on the ballot at the time of its display by the State Board was appropriate under the terms of Section 9–205(4).

[8] The plain language of Section 9–205, when read in relation to Section 9–209, does not provide a vehicle for a registered voter to challenge the candidate's underlying eligibility as determined by the State Board. Rather, it only

provides a mechanism by which such a voter may contest the inclusion of the name of a candidate who is not certified by the State Board or the exclusion of the name of one who is certified.

Moreover, to hold that a registered voter must comply with such a limited time period to obtain judicial review of a candidate's qualifications, effectively would preclude a registered voter from seeking redress for conduct occurring after the three-day period contained in Section 9–209. We find this construction to be "unreasonable, illogical, unjust, [and] inconsistent with common sense," *Pelican Nat. Bank v. Provident Bank of Md.*, 381 Md. 327, 336, 849 A.2d 475, 480 (2004), quoting *Pak v. Hoang*, 378 Md. 315, 323, 835 A.2d 1185, 1189 (2003), because to bar judicial review of a candidate's qualifications for a failure to comply with such a restrictive window of time would curtail severely the ability to prevent potential wrongdoing from affecting the outcome of an election and undermines the confidence in the election process as a whole. Therefore, the grant of the motion for summary judgment in this case solely on the basis of Section 9–209 was erroneous.

As we stated previously, "[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment." *Eid*, 373 Md. at 10, 816 A.2d at 849. We have likewise recognized, however, that "this principle is applicable only when there are two or more separate and distinct grounds for the grant of summary judgment, and the trial court relies on one, but not another, in granting summary judgment." *Id.* Conversely, when there are two or more similar and intertwined grounds for the grant of summary judgment, we may consider the related ground if raised by a litigant, when the first basis for summary judgment is invalidated. *Id.*

▮ In the present case, Ross's petition, though not governed by Section 9–209, was governed by Section 12–202 of the Election Code, which provides for a ten-day "window" for seeking judicial redress for an act or omission that violates the

Election Law Article and has or would change the outcome of the election once the registered voter knows of it. Ross appears to concede, by attaching the Baltimore Sun article to his initial petition filed in the Circuit Court, that he knew of Branch's campaign finance entity's failure to file campaign finance reports on October 13th. Thus, under the operation of the ten-day time period in Section 12–202, Ross should have filed his petition at least a week before the election, that is, by October 23rd. Instead, he waited until November 5th, a full three days after the election occurred. Therefore, we find that it is barred as a matter of law by the common law doctrine of laches as argued by Respondents in the Circuit Court and before this Court.[8]

Laches "is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *Parker v. Board of Election Supervisors*, 230 Md. 126, 130, 186 A.2d 195, 197 (1962). The doctrine of laches arose out of the equity courts of England and developed during a period in which equity courts were not subject to statutes of limitations passed by Parliament. Gail L. Heriot, *A Study in the Choice of Form: Statutes of Limitation and the Doctrine of Laches*, BYU L.Rev. 917, 926 (1992); *see Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed.Cir.1988), citing 2 J. Pomeroy, *Equity Jurisprudence* §§ 418–19 (5th ed.1941). Because stale demands, usually involving the loss of witnesses or records, offended the Chancellor's sense of fairness, courts of equity customarily refused to grant an equitable remedy in appropriate cases. 1 J. Pomeroy, *Equity Jurisprudence* § 419 (1905). In *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743, 745 (1946), Justice Frankfurter, writing for the Supreme Court, described the operation of laches:

Traditionally and for good reasons, statutes of limitation are not controlling measures of equitable relief. Such statutes

---

8. Even if we were to agree with Ross that the ten-day time period under Section 12–202 began to run on October 26th, when the State Board declined to act, his action would remain barred by laches.

have been drawn upon by equity solely for the light they may shed in determining that which is decisive for the chancellor's intervention, namely, whether the plaintiff has inexcusably slept on his rights so far as to make a decree against the defendant unfair. . . .

The doctrine of laches first appears in the records of the Maryland Chancery Court proceedings of 1679. *Proceedings of the Court of Chancery, 1669–1679*, Vol. 51 at 561. The doctrine was recognized in this Court as well. *See, e.g., Demuth v. Old Town Bank of Baltimore*, 85 Md. 315, 317–18, 37 A. 266, 268–69 (1897); *Williams' Ex'rs v. Mayor and City of Annapolis*, 6 H. & J. 529 (1825); *Pearce v. Wallace*, 1 H. & J. 48 (1800). Throughout our history, we consistently have adhered to the principle that "[t]here is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Parker*, 230 Md. at 130, 186 A.2d at 197, citing *Brashears v. Collison*, 207 Md. 339, 352, 115 A.2d 289, 295 (1955); *Demuth*, 85 Md. at 317–18, 37 A. at 268–69.

In *Buxton v. Buxton*, 363 Md. 634, 770 A.2d 152 (2001), we recently had the opportunity to examine the elements of laches:

[T]he word, itself, derives from the old French word for laxness or negligence. . . . The passage of time, alone, does not constitute laches but is simply 'one of many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made.' In that regard, there *is* a relationship between laches and the statute of limitations, although the statute does not govern.

We held that, '[i]n a purely equitable action, a lapse of time shorter than the period of limitations may be sufficient to invoke the doctrine; and, where the delay is of less duration than the statute of limitations, the defense of laches must include an unjustifiable delay and some amount of prejudice to the defendant.' 'What amounts to "prejudice," such as will bar the right to assert a claim after the passage of time, depends upon the facts and circumstances

of each case, but it is generally held to be any thing that places him in a less favorable position.' *Id.* Finally ... we stated in *Parker* that 'since laches implies negligence in not asserting a right within a reasonable time after its discovery, a party must have had knowledge, or the means of knowledge, of the facts which created his cause of action in order for him to be guilty of laches.'

*Buxton,* 363 Md. at 645–46, 770 A.2d at 158–59 (emphasis in original; citations omitted). Moreover, "even where such impermissible delay is present under the circumstances presented, if the delay has not prejudiced the party asserting the defense, it will not bar the equitable action." *Schaeffer v. Anne Arundel County,* 338 Md. 75, 83, 656 A.2d 751, 755 (1995). Thus, for laches to bar Ross's action there must be both an inexcusable delay and prejudice to Respondents.

We recognize, nevertheless, that generally courts sitting in equity will apply statutory time limitations. *See Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 63, 300 A.2d 367, 385 (1973); *Desser v. Woods,* 266 Md. 696, 704, 296 A.2d 586, 591 (1972); *Gloyd v. Talbott,* 221 Md. 179, 186, 156 A.2d 665, 668 (1959). Courts exercising equity jurisdiction, however, are not irrevocably bound to the statutory time limitations. *See Stevens v. Bennett,* 234 Md. 348, 351, 199 A.2d 221, 223–24 (1964) (stating, "even when the remedy for a claimed right is only in equity the period of limitations most nearly apposite at law will be invoked by an equity court, provided there is not present a more compelling equitable reason—such as fraud or inequitable conduct which would cause injustice if the bar were interposed—why the action should not be barred"); *Parker,* 230 Md. at 130, 186 A.2d at 197 (holding, "[i]n a purely equitable action, a lapse of time shorter than the period of limitations may be sufficient to invoke the doctrine; and, where the delay is of less duration than the statute of limitations, the defense of laches must include an unjustifiable delay and some amount of prejudice to the defendant"). Thus, the courts are free, if the equities so require, to assess the facts of a purely equitable action independent of a statutory time limitation applicable at law.

We also recognize that some federal courts have adopted a *per se* rule with respect to the application of laches to claims arising out of elections, stating that "any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir.1990) (noting that "any claim against a state electoral procedure must be expressed expeditiously" because "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made"), *cert. denied* 501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991); *see, e.g., Kay v. Austin,* 621 F.2d 809, 813 (6th Cir.1980) (laches applied where candidate waited two weeks after he knew he would not be listed on ballot to file suit and preliminary work had been done for the election); *MacGovern v. Connolly,* 637 F.Supp. 111, 115 (D.Mass.1986) (noting that delays in filing are disfavored because courts "should endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree"); *Barthelmes v. Morris,* 342 F.Supp. 153, 160–61 (D.Md.1972) (stating that although the election process is filled with uncertainty, the courts should not add "wholly unanticipated uncertainties at the eleventh hour"). We need not decide here whether a *per se* rule should apply. There may be situations in which such a rule would be inappropriate.[9]

---

9. See, e.g., *Melendez v. O'Connor,* 654 N.W.2d 114, 117 (Minn.2002) (holding that laches did not apply where candidate did not satisfy residency requirement to hold office and therefore suffered no prejudice due to the delay); *Gallagher v. Keefe,* 232 Mich.App. 363, 591 N.W.2d 297, 300–01 (1998) (same); *cf. McComb v. Superior Court In and For the County of Maricopa,* 189 Ariz. 518, 943 P.2d 878, 885–86 (Ct.App.1997) (permitting a reapportionment claim to proceed although filed twenty days after the election); *Schaeffer v. Anne Arundel County,* 338 Md. 75, 80–81, 656 A.2d 751, 753–54 (1995) (applying laches to a claim based upon a procedural defect concerning an ordinance but noting that it would not apply if the ordinance were intrinsically void).

We are not presented, however, with such a challenge in the case *sub judice;* rather, Ross's claim arises out of a statutory provision explicat-

Because laches properly may be applied to Ross's claim, we must determine whether his actions amount to an unreasonable delay that prejudiced the interests of Respondents. Petitioner did not produce any explanation for his delay in filing his action until three days after the election occurred, other than his reliance upon the language of Section 12–202, which provides that a petition for judicial review may be filed whether or not the election has occurred. Md.Code (2002), § 12–202 of the Election Law Article. Ross's unjustified delay must be juxtaposed against his duty to petition for redress without delay when the election approaches: "Courts have imposed a duty on parties having grievances based on election laws to bring their complaints forward for pre-election adjudication when possible." *Hendon v. North Carolina State Board of Elections,* 710 F.2d 177, 182 (4th Cir.1983), citing *Toney v. White,* 488 F.2d 310, 314 (5th Cir.1973); *see e.g., Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176, 1180 (9th Cir.1988); *McComb,* 943 P.2d at 886. As the Court of Appeals for the Fourth Circuit aptly stated in *United States v. City of Cambridge, Maryland,* 799 F.2d 137 (4th Cir.1986), "a candidate or other election participant should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether they will be successful at the polls." *Id.* at 141. Therefore, Ross's delay is unjustifiable as a matter of law.

Ross's decision to "wait and see" until after the election, prejudiced Branch, the State Board of Elections, and the residents of the Thirteenth Councilmanic District. Branch relied upon her certification by the State Board as a qualified candidate for the office and the result of the election in which she overwhelmingly won, only to have the results belatedly challenged on a ground that was ripe prior to Election Day. The State Board likewise was prejudiced because it too relied upon the correctness of the ballots and expended considerable

---

ing the penalties for the failure of a campaign entity to comply with the procedures for filing campaign finance reports.

efforts in overseeing the election when Branch's candidacy could have been protested judicially prior to the election on November 2nd. Most importantly, Petitioner's actions also prejudiced the electorate as a whole by denying them the efficacy of their vote and undermining their faith in a free and fair election. Thus, because Petitioner's delay would result in Respondents and the people of the Thirteenth Councilmanic District being placed in a less favorable position due to their justifiable reliance on the circumstances in existence on Election Day, we find Petitioner's actions sufficiently prejudicial so as to warrant the application of laches. Therefore, we conclude that the doctrine of laches bars Petitioner's claim as a matter of law, and we uphold the Circuit Court's decision to grant summary judgment in favor of Respondents.

## Conclusion

Although the Circuit Court erroneously granted summary judgment based on its view that Ross's claim was untimely under Section 9–209 of the Election Law Article, we affirm the grant of summary judgment in favor of Branch and the State Board of Elections because Ross's action is barred as a matter of law by the closely related common law doctrine of laches, under the circumstances of this case, due to his failure to file his petition prior to the election.

*JUDGMENT AFFIRMED. COSTS IN THIS COURT TO BE PAID BY PETITIONER.*

Dissenting Opinion by BELL, Chief Judge, which RAKER, Judge, joins.

As the majority acknowledges, *Ross v. State Board of Elections,* 387 Md. 649, 658–59, 876 A.2d 692, 697–98 (2005), "[i]n appeals from grants of summary judgment, Maryland appellate courts, as a general rule, will consider only the grounds upon which the [trial] court relied in granting summary judgment." *PaineWebber v. East,* 363 Md. 408, 422, 768 A.2d 1029, 1036 (2001). *See Eid v. Duke,* 373 Md. 2, 10, 816 A.2d 844, 849 (2003); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 729 (2001). There are good reasons for that

general rule. We stated those reasons in *Geisz v. Greater Baltimore Med. Ctr.*, 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988):

> "On an appeal from the grant of a summary judgment which is reversible because of error in the grounds relied upon by the trial court the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment. For example, a motion might be denied in order to allow the party opposing the motion a further opportunity through discovery to present a triable issue of fact. See *Metropolitan Mtg. Fund v. Basiliko*, 288 Md. 25, 415 A.2d 582 (1980). Thus, in *Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986), a case of alleged negligent hiring, we reversed a summary judgment for a defendant because, contrary to the trial court's conclusion, we found a triable issue of hiring. We would not, however, consider if a lack of proximate cause was an alternative support for the judgment because '[t]he effect of our ruling on the issue of proximate cause, or any other issue not considered by the trial judge would be to deprive the trial judge of discretion to deny or to defer until trial on the merits the entry of judgment on such issues.' *Id.* at 333, 503 A.2d at 1340."

In other words, as clarified in *Gresser v. Anne Arundel County*, 349 Md. 542, 552, 709 A.2d 740, 745 (1998), "we will not speculate that summary judgment might have been granted on other grounds not reached by the trial court."

On the other hand, as the majority likewise recognizes, 387 Md. at 658–59, 876 A.2d at 697–98, there is an exception to the general rule. The principle it espouses "is applicable only when there are two or more separate and distinct grounds for the grant of summary judgment, and the trial court relies on one, but not another, in granting summary judgment," *Eid v. Duke*, 373 Md. at 10, 816 A.2d at 849, or when, as the majority puts it, "two grounds are so interrelated that they cannot be properly considered as separate and distinct." 387 Md. at 659,

876 A.2d at 698. We are not without precedent with respect to the application of the exception. *PaineWebber v. East,* 363 Md. 408, 768 A.2d 1029 (exception inapplicable); *Eid v. Duke,* 373 Md. 2, 816 A.2d 844 (exception applicable).

In *PaineWebber v. East,* two of the counterclaim defendants sought summary judgment against PaineWebber on two grounds, that the plaintiff had waived her rights under the IRA account at issue and because one of the counterclaim defendants had been designated expressly by the owner of the account as the beneficiary of that account. 363 Md. at 412, 768 A.2d at 1031. The trial court granted summary judgment on the former ground, concluding that the plaintiff effectively had waived her rights to the proceeds of the account. *Id.* It did not address the latter ground, whether the owner of the account had "effected a change of beneficiary." *Id.* This Court concluded, as the Court of Special Appeals previously had done, *East v. PaineWebber, Inc.,* 131 Md.App. 302, 316, 748 A.2d 1082, 1089 (2000), that the plaintiff had not waived her right as the named beneficiary of the IRA account and, thus, determined that the trial court erred in granting summary judgment on that basis. 363 Md. at 417, 768 A.2d at 1033. It then refused PaineWebber's invitation to affirm the trial court's grant of summary judgment on the alternate ground presented to the trial court, explaining:

"Here, the alternate ground urged by the Estate presents mixed issues of fact and law. Without suggesting any materiality to the facts, and inferences therefrom, as they appear in the record as presently constituted, there has been no determination whether there was a change of beneficiary form, executed by Dewey, that was lost by PaineWebber, whether, by leaving the beneficiary designation blank on a form that he signed, Dewey intended that the Estate be the beneficiary of the IRA, and whether there was compliance with PaineWebber's rules for effecting a change in beneficiary of an IRA. The circuit court, at the

very least, had discretion to deny summary judgment on the alternate ground. Thus, we shall not consider those issues." *Id.* at 423, 768 A.2d at 1037.

*Eid v. Duke* is at the other end of the spectrum. There, two motions for summary judgment were presented to the trial court. 373 Md. at 9, 816 A.2d at 848. The first was based on preemption, asserting that the plaintiffs' tort claims were preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA). The second challenged the basis for a tort claim under Maryland law, arguing that there never was a patient-physician relationship between Mr. Eid and Dr. Duke. *Id.* The trial court's grant of summary judgment was premised on ERISA preemption; it did not expressly address or rule on the lack of a patient-physician relationship. The Court of Special Appeals affirmed. *Id.* Although it held that the plaintiffs' state law tort law claims were preempted, during its analysis the intermediate appellate court "distinguished the facts of the instant case from other authority cited by the plaintiffs where the court had found that a physician-patient relationship existed to sustain a medical malpractice claim that was not preempted by ERISA." *Id.* In the course of that discussion, it emphasized that "Dr. Duke never met or spoke with Eid, and made 'his recommendations as to benefit eligibility . . . solely as a result of a paper file . . . and a one-time consultation with [Eid's] treating physician.'" *Id.* at 10, 816 A.2d at 849. In addition to seeking certiorari on the preemption issue, seizing on the intermediate appellate court's reference to the physician-client relationship when resolving the preemption question, the plaintiffs asked this court to decide whether "the Court of Special Appeals erred by relying on the lack of a patient-physician relationship when the trial court did not grant summary judgment on that ground." *Id.* Addressing the latter argument, this Court was of the view that "because of the interrelationship of the issues, the Court of Special Appeals did not uphold a grant of summary judgment on a ground which was separate and distinct from the ground relied on by the trial court." *Id.* at 11, 816 A.2d at 849. This was so, we explained, because:

"The two motions for summary judgment in the case at bar were not based on separate and distinct grounds. Under circumstances like those in the present case, the issue of ERISA preemption is inextricably intertwined with the existence of a patient-physician relationship and whether the plaintiffs set forth a viable state law medical malpractice cause of action. As the Court of Special Appeals recognized . . ., these issues are interrelated under the Supreme Court cases interpreting and applying the ERISA statute. In fact, the plaintiffs indirectly acknowledge that the issues are interrelated, as they repeatedly characterize their action as a medical malpractice action and rely on cases holding that ERISA does not preempt traditional state law medical malpractice actions . . . ."

*Id.*

Glenn L. Ross, the petitioner, in an effort to unseat Paula Johnson Branch (Branch), one of the respondents, whom he alleged was ineligible for election in the district, but to whom he had lost the general councilmanic election, filed, in the Circuit Court for Baltimore City, a petition for "Immediate Injunctive Relief and Declaratory Judgment Under Maryland Election Law and Request for Hearing" and, subsequently, for summary judgment. Branch and the State Board of Elections, the other respondent, in addition to moving both to dismiss and for summary judgment, responded to the petitioner's summary judgment motion. In each submission, they argued that the petitioner's claim was barred by both § 9–209[1] and

---

**1.** Maryland Code (2002) § 9–209 of the Election Law Article provides:

 "(a) *Timing.*—Within 3 days after the content and arrangement of the ballot are placed on public display under § 9–207 of this subtitle, a registered voter may seek judicial review of the content and arrange-ment, or to correct any other error, by filing a sworn petition with the circuit court for the county.

 "(b) *Relief that may be granted.*—The circuit court may require the local board to:

 "(1) correct an error;

 "(2) show cause why an error should not be corrected; or

 "(3) take any other action required to provide appropriate relief.

§ 12–202 [2] of the Election Law Article, Maryland Code (2002) inasmuch as the petitioner failed to satisfy either of the time frames prescribed by those statutes. Agreeing with the respondents with respect to their § 9–209 argument, the Circuit Court granted summary judgment in favor of the respondents on that basis. It did not rule on the § 12–202 argument; notwithstanding that, as framed by Branch, it squarely presented the laches argument, which this Court today adopts.

This Court granted certiorari to consider the petitioner's challenge to the Circuit Court's grant of summary judgment for his failure to comply with the time requirements of § 9–209 and the respondents' joint cross petition for certiorari, raising, *inter alia*, the applicability of § 12–202 and the timeliness of the appeal filed by the petitioner pursuant thereto. With respect to the petitioner's challenge, the Court concludes "that the Circuit Court erred in granting summary judgment in favor of Respondents based on Section 9–209 of the Election Law Article." 387 Md. at 658, 876 A.2d at 697. I agree with this holding. Nevertheless, notwithstanding that it was not a ground relied on by the Circuit Court, the Majority

---

"(c) *Errors discovered after printing.*—If an error is discovered after the ballots have been printed, and the local board fails to correct the error, a registered voter may seek judicial review not later than the second Monday preceding the election."

2. Maryland Code (2002) § 12–202 of the Election Law Article provides:
"(a) *In general.*—If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds of an act or omission:
"(1) is inconsistent with this article or other law applicable to the election process; and
"(2) may change or has changed the outcome of the election.
"(b) *Place and time of filing.*—A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:
"(1) 10 days after the act or omission or the date the act or omission became known to the petitioner; or
"(2) 7 days after the election results are certified, unless the election was a gubernatorial primary or special primary election, in which case 3 days after the election results are certified."

upholds the grant of summary judgment. Although, as indicated, the majority recognizes the scope of the exception to the general rule limiting review of summary judgments to the grounds relied on by the trial court and earlier had accurately stated it in the majority opinion—"[w]here ... two grounds are so interrelated that they can not be properly considered as separate and distinct", *id.* at 659, 876 A.2d at 698, rather than make a case for the exception, demonstrate the interrelationship of the two grounds for appeal,[3] the majority asserts, I suggest, baldly,[4] that "Ross's claim remains untimely under

---

**3.** The majority's effort in this regard consists of the following:

"In the present case, Ross's petition, though not governed by Section 9–209, was governed by Section 12–202 of the Election Code, which provides for a ten day "window" for seeking judicial redress for an act or omission that violates the Election Law Article and has or would change the outcome of the election once the registered voter knows of it. Ross appears to concede, by attaching the Baltimore Sun article to his initial petition filed in the Circuit Court, that he knew of Branch's campaign finance entities' failure to file campaign finance reports on October 13th. Thus, under the operation of the 10–day time period in Section 12–202, Ross should have filed his petition at least a week before the election, that is, by October 23rd. Instead, he waited until November 5th, a full three days after the election occurred. Therefore, we find that it is barred as a matter of law by the common law doctrine of laches as argued by Respondents in the Circuit Court and before this Court."

387 Md. at 667–69, 876 A.2d at 702–03.

This simply does not demonstrate an interrelatedness such that separate consideration is inappropriate. Granted, however, there is a similarity and a certain intertwinement, *see Ross v. State Board of Elections,* 387 Md. 649, 667–68, 876 A.2d 692, 702–03 (2005) (purporting to restate the exception to the general rule as "when there are *two or more similar and intertwined grounds* for the grant of summary judgment, we may consider the related ground if raised by a litigant, when the first basis for summary judgment is invalidated") (emphasis added), between §§ 9–209 and 12–202, but that relationship is not the test.

**4.** Laches is an equitable doctrine, a defense against stale claims. Whether a claim is barred by laches, therefore, "must be determined by the facts and circumstances of each case." *Parker v. Board of Election Supervisors,* 230 Md. 126, 130, 186 A.2d 195, 197 (1962). The majority has decried the need for and denied any intention to announce a *per se* rule with respect to laches in election cases. 387 Md. at 671–72, 876 A.2d at 705. Consequently, the trial court, as to that ground, had the discretion to deny summary judgment.

It also is interesting to note that the support, the only support, I might add, for the proposition that there are no disputed material facts,

the doctrine of laches as a matter of law; ... there are no disputes of material fact bearing on the issue; and ... there is no basis upon which the court could have legitimately denied summary judgment on that issue, which was properly raised by Respondents." *Id.* at 658, 876 A.2d at 697.

The majority does not demonstrate the interrelatedness of §§ 9–209 and 12–202, because it cannot. Section 9–209 is a separate and distinct ground for appeal in an election case from § 12–202. Section 9–209 is not inextricably intertwined with § 12–202 and the right to appeal an adverse decision in an election case. An appeal may successfully be maintained pursuant to either § 9–209 or § 12–202 without there ever being a need to discuss any aspect of the other statute. The time frame that governs the right of appeal pursuant to § 9–209 bears no relationship to, and is not necessary to be discussed in connection with, the time constraints prescribed by § 12–202. This case is not, in short, *Eid v. Duke,* where the discussion of the existence, or not, of a patient-physician relationship was a necessary topic in the preemption analysis. This case is more like *PaineWebber v. East,* in which, while waiver and the express designation of a beneficiary have a certain similarity and relationship, determination of one did not necessarily determine or make consideration of the other essential.

The majority may well be correct insofar as the result is concerned. I suspect that, were the matter properly before us for review, I would find no fault with the conclusion the majority is so anxious to reach. Indeed, I would not quarrel with the issue of the petitioner's laches being addressed for the guidance of the trial court on remand. I simply can not, and will not, condone the taking of a shortcut when none is permitted and when to do so requires that we make yet

---

to which the majority directs our attention, is the petitioner's attachment to his initial petition of a Baltimore Sun article, from which the majority perceives the appearance of a concession. 387 Md. at 667–69, 876 A.2d at 702–03.

another exception to the general rule, this one for a case that, for all that appears, is destined to result after remand, in a judgment for the respondents. If a shortcut can be constructed in this case, one may have to be constructed in another, in which the outcome on remand is readily and painfully obvious, and then another. The ability to distinguish will become more and more indistinct as the facts and circumstances in one case shade into another and others. The exceptions will eventually swallow the rule.

I dissent.

Judge RAKER joins in the views herein expressed.