*Maryland State Board of Elections, et al. v. Anthony J. Ambridge, et al.*, No. 26, September Term, 2024, Opinion by Booth, J.

**ELECTION LAW CHALLENGES — CHALLENGES TO CHARTER AMENDMENT BALLOT QUESTIONS INITIATED BY LEGISLATIVE BODY UNDER ARTICLE XI-A OF THE MARYLAND CONSTITUTION**

Section 9-203 of the Election Law Article ("EL") of the Maryland Code (2022 Repl. Vol., 2024 Supp.) is not a proper mechanism to challenge either: (1) whether a ballot question pertaining to a proposed charter amendment is proper charter material; or (2) whether the charter amendment's ballot language satisfies the minimum standards under Maryland law for understandability and clarity.

**ELECTION LAW CHALLENGES — DOCTRINE OF LACHES**

Election challengers filed a petition for judicial review under EL § 12-202, which raised two challenges to a Baltimore City charter amendment, known as "Question F," that was proposed by a Charter Bill enacted by the Baltimore City Council. The challengers asserted that (1) the subject matter of the proposed charter amendment was not proper "charter material," and (2) the language of the ballot was not understandable. The Supreme Court of Maryland held that both claims were barred by laches. With respect to the challenge related to the ballot's subject matter, the challengers waited almost five months after the enactment of the Charter Bill to assert the claim. As for the understandability of the ballot question language, the challengers waited four weeks after the statutory deadline for the certification of the ballot question to raise their claim. The Court held that the unreasonable delay in filing the petition for judicial review caused prejudice not only to the State Board and the City Council, but, perhaps most importantly, to the Baltimore City electorate.

**ARTICLE XI-A "CHARTER MATERIAL" FRAMEWORK — APPLICABILITY TO CHARTER AMENDMENTS PROPOSED BY THE ELECTED LEGISLATIVE BODY OF A CHARTER COUNTY**

Given the Court's holding pertaining to laches, the Supreme Court declined to decide whether the circuit court erred in ruling that Question F's subject matter violated Article XI-A of the Maryland Constitution because it was not "proper charter material"—an issue that the City requested that this Court address. Adhering to the Court's well-established policy to decide constitutional questions only when necessary, the Supreme Court concluded that it would save the issue raised by the City for another case.

## ELECTION LAW — UNDERSTANDABILITY AND CLARITY OF BALLOT QUESTION LANGUAGE

The ballot question language comprising Question F conveyed, with minimum reasonable clarity, the actual scope and effect of the measure to permit an average voter, in a meaningful manner, to exercise an intelligent choice in voting for or against Question F.

IN THE SUPREME COURT
OF MARYLAND

No. 26

September Term, 2024

MARYLAND STATE BOARD OF
ELECTIONS, ET AL.

v.

ANTHONY J. AMBRIDGE, ET AL.

Fader, C.J.,
Booth,
Biran,
Gould,
Eaves,
Killough,
Battaglia, Lynne A.
  (Senior Justice, Specially
  Assigned)

JJ.

Opinion by Booth, J.

Filed: January 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Anthony J. Ambridge, along with 22 other Baltimore City registered voters,[1] the Appellees, filed a petition seeking judicial review of a proposed amendment to the Baltimore City Charter—commonly referred to as "Question F"—which was to appear on the 2024 general election ballot. Mr. Ambridge initially filed his petition on September 5, 2024, in the Circuit Court for Anne Arundel County, pursuant to § 9-209(a) of the Election Law Article of the Maryland Code ("EL"). The petition was amended on September 6 to add the additional petitioners and amended a second time on September 9 to add a claim under § 12-202 of the Election Law Article.

The Maryland State Board of Elections ("State Board")[2] opposed the petition on the grounds, among others, that judicial review pursuant to § 9-209(a) was not an appropriate mechanism to raise the petitioners' claims and that the claims pursuant to § 12-202 were barred by laches.

---

[1] The operative petition identifies the following petitioners: Anthony J. Ambridge, Linda L. Batts, Brent Bederka, Elizabeth Bement, Carol Lois Berkower, Teporah Bilezikian, Jennifer M. Boyer, Leon Bridges, Lauren Brown, Sharon Dlhosh, Johanna Doble, Michael S. Donnenberg, Dolph Druckman, Paula J. Fernandes, Robert Merbler, Ellen Meyer, James Prost, Winstead Rouse, Donna Shapiro, Sandra Seward, Olivia Taylor, David Tufaro, and Katherine Venanzi. For ease of reference, we shall sometimes collectively refer to the Appellees as "Mr. Ambridge."

[2] The State Board of Elections consists of five members who are appointed by the Governor with the advice and consent of the Maryland Senate. Md. Code Ann. (2022 Repl. Vol., 2024 Supp.) Election Law ("EL") § 2-101. The composition of the State Board is divided between the two primary political parties—it must consist of no more than three but no fewer than two members of the same principal political party. § 2-102(e)(1) and (2). The members serve staggered four-year terms, and no member may serve more than three consecutive terms. § 2-102(f)(1) and (2).

On September 17, 2024, after a hearing, the circuit court issued a memorandum opinion and order in which it determined that the petitioners' claims were not barred by laches and could be raised pursuant to § 9-209(a). On the merits, the circuit court determined that Question F: (1) "violates Article XI-A § 3 of the Maryland Constitution in that it is not proper charter material"; and (2) alternatively, violates EL § 9-205(2), which requires that each ballot contain "a statement of each question that has met all of the qualifications to appear on the ballot," because the language is not "easily understandable by voters," as required by § 9-203(1). As a remedy, the circuit court ordered that "the Baltimore City Board of Elections shall not certify the results of Ballot Question 'F' arising from the 2024 General Election for the City of Baltimore[.]"

Thereafter, the Appellants, Mayor and City Council of Baltimore ("City") and MCB HP Baltimore LLC ("MCB"), moved to intervene as defendants. The circuit court granted the motions to intervene on September 20, and on the same day, the State Board, City, and MCB noted direct appeals from the circuit court's judgment to this Court pursuant to §§ 9-209(d)(1)(ii) and 12-203(a)(3).

After entering an expedited briefing schedule, we held oral argument on October 9, and, on the following day, we issued a per curiam order reversing the order issued by the circuit court on September 17, 2024, and remanding the case to the circuit court for entry of judgment in favor of the Appellants. In our order, we held that: (1) EL § 9-209(a) is not a proper mechanism to challenge either whether a proposed charter amendment is proper charter material or whether the language of a proposed charter amendment comports with

2

§ 9-203(1); (2) the circuit court erred in entering judgment in favor of petitioners on their claim that Question F violates Article XI-A, § 3 of the Constitution of Maryland; (3) Question F is not improper charter material;[3] and (4) the circuit court erred in entering judgment in favor of petitioners on their claim that Question F violates EL §§ 9-203(1) and 9-205(2). We further ordered that the appropriate election authority may certify the results of Question F as presented on the November 2024 general election ballot. We now explain the basis for that order.

# I

## Constitutional, Statutory, and Charter Provisions

### A. Article XI-A of the Constitution of Maryland

Maryland voters ratified Article XI-A of the Constitution of Maryland in 1915, popularly known as the Home Rule Amendment, which provides for the distribution of powers between the General Assembly and the political subdivisions of the State. As we described in *Cheeks v. Cedlair Corp.*, "the underlying purpose of the Article is to share with the counties and Baltimore City, within well-defined limits, powers formerly reserved to the General Assembly so as to afford the subdivisions certain powers of self-government." 287 Md. 595, 597 (1980) (citing *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*, 283 Md. 48 (1978); *Baltimore v. Sitnick & Firey*, 254 Md. 303 (1969); *Montgomery Citizens League v. Greenhalgh*, 253 Md. 151 (1969)).

---

[3] As discussed in note 31 *infra*, given the Court's holding that Mr. Ambridge's substantive challenges are barred by laches, this Court revises the per curiam order to excise its holdings pertaining to the circuit court's ruling that Question F violated Article XI-A, § 3 and constituted improper charter material.

Pursuant to Article XI-A, § 1 of the Maryland Constitution,[4] the Baltimore City voters adopted a charter in the 1918 general election. Article XI-A, § 5 of the Maryland Constitution provides two methods for proposing an amendment to the Baltimore City Charter: (1) by a resolution passed by the Mayor and City Council; or (2) by filing a citizen-initiated petition filed with the Mayor.[5] A charter amendment properly proposed by one of these methods shall be submitted to the voters at the next general or congressional election, and if a majority of the electorate votes in favor of the amendment, it shall become part of the charter. *Id.*

---

[4] Baltimore City, like charter counties, is an Article XI-A jurisdiction rather than a municipal corporation governed by Article XI-E of the Maryland Constitution. Section 1 of Article XI-A of the Maryland Constitution provides for the election of a charter board in Baltimore City or any county to prepare "a charter or form of government," which, if adopted by the voters, "shall become the law of the City or County, subject only to the Constitution and Public General Laws of this State[.]"

[5] Article XI-A, § 5 of the Maryland Constitution states:

Amendments to any charter adopted by the City of Baltimore or by any County of this State under the provisions of this Article may be proposed by a resolution of the Mayor of Baltimore and the City Council of the City of Baltimore, or the Council of the County, or by a petition signed by not less than 20% of the registered voters of the City or County, provided, however, that in any case 10,000 signatures shall be sufficient to complete a petition. A petition shall be filed with the Mayor of Baltimore or the President of the County Council. An amendment so proposed shall be submitted to the voters of the City or County at the next general or congressional election occurring after the passage of the resolution or the filing of the petition. If at the election the majority of the votes cast for or against the amendment shall be in favor thereof, the amendment shall be adopted and become part of the charter of the City or County from and after the thirtieth day after said election. The amendments shall be published by the Mayor of Baltimore or President of the County Council once a week for five successive weeks prior to the election in at least one newspaper published in said City or County.

4

### B.    *Pertinent State Election Laws*

#### *1. Ballot Text and Preparation Generally*

A ballot that is ultimately prepared by the State Board for use in a general election may contain several different types of ballot questions that are presented to the voters, such as a proposed amendment to the State Constitution, a referendum on an enactment of the General Assembly, or a local charter amendment that is authorized by the State Constitution.  For many types of ballot questions, the text of the ballot question is governed by the provisions of EL § 7-103.[6]  Specifically, the ballot question text must contain five components: "(1) a question number or letter as determined under subsection (d) of this section; (2) a brief designation of the type or source of the question; (3) a brief descriptive title in boldface type; (4) a condensed statement of the purpose of the question; and (5) the voting choices that the voter has."  § 7-103(b).

Although subsection (b) establishes the same uniform requirements for ballot questions regardless of where the question originates, subsection (c) assigns the *drafting and certification responsibilities* to a different individual or entity depending on the type of ballot question.  For example, the Secretary of State is required to "prepare and certify to the State Board . . . all statewide ballot questions and all questions relating to an enactment of the General Assembly which is petitioned to referendum."  § 7-103(c)(1).

---

[6] See *Stop Slots Md. 2008 v. State Board of Elections*, 424 Md. 163, 191 n.16 (2012), for a discussion of the legal requirements and standards governing ballot questions when a proposed constitutional amendment is submitted to the electorate for approval pursuant to Article XIV of the Maryland Constitution, and the General Assembly's authority to submit a law to voters for referendum under Article XVI.

The State Board is required to prepare and certify ballot questions "that have been referred to the voters of one county or part of one county pursuant to an enactment of the General Assembly." § 7-103(c)(2). The county attorney or municipal attorney is required to prepare and certify ballot questions for charter amendments that are proposed by a legislative enactment passed by the respective county or municipality in question. § 7-103(c)(3)–(4). And a charter amendment ballot question that arises by a citizen-initiated petition may be prepared by the individual or organization circulating the petition, § 7-103(c)(5), and, as discussed more fully below, certified by the chief election official (in Baltimore City, the City Election Director), § 6-208(c).

Regardless of where the ballot question originates, it must ultimately be certified by either the drafter or the chief election official of the local election board (in the case of a charter amendment ballot question originating by a citizen-initiated petition) to the State Board as having been qualified for inclusion on the ballot. *Id.* To ensure the timely and efficient preparation of election ballots, which in turn promotes the fair administration of the elections generally, the General Assembly also established a multitude of deadlines, qualification and certification processes, and remedies for judicial review of certain matters that arise from disputes related to ballot questions.

Here, we are concerned with the process by which a proposed charter amendment moves from legislation enacted by a local legislative body under Article XI-A, § 5 of the Maryland Constitution to a ballot question. As discussed below, the General Assembly has enacted a separate statutory process depending on whether the proposed amendment arises

6

from a legislative enactment or a citizen-initiated petition.  Although this case involves a proposed charter amendment arising from a legislative enactment, we discuss both processes because the statutory distinctions between them ultimately inform our analysis.

### 2. Charter Amendment Ballot Questions Arising from a Legislative Resolution

For a legislatively initiated charter amendment in Baltimore City, a ballot question "qualifies" for placement on the ballot immediately upon "passage" by the City Council "of a resolution proposing the amendment[.]"  § 7-102(c)(3)(i).  After the resolution is passed, the City Law Department is solely responsible for drafting a Baltimore City charter amendment and ensuring that the text of the ballot question contains all five statutory components. § 7-103(c)(3)(i).  The City Law Department is required to certify the ballot question language to the State Board "not later than the 95th day before the general election[.]"[7]  *Id.*  The State Board does not play any role in the qualification, drafting, or certification of the charter amendment ballot question.

### 3. Charter Amendment Ballot Questions Arising from a Citizen-Initiated Petition

Charter amendment ballot questions that are initiated by a citizen petition follow a different drafting, review, qualification, and certification process.[8]  Title 6 of the Election

---

[7] If the Law Department fails to prepare and certify a question's language in time, it falls to the "clerk of the circuit court" to prepare and certify the question language before the first Friday in August.  EL § 7-103(c)(3)(ii).

[8] Article XI-A, § 7 of the Maryland Constitution confers upon the General Assembly the power to specify the details of the petition process.

7

Law Article governs citizen-initiated charter amendment ballot questions.[9]  Although a

petition-initiated ballot question involving a charter amendment must contain the same five

ballot components, *see* § 7-103(b), it may be drafted by the petitioning individuals or

organization, *see* § 7-103(c)(5).  The petition must be filed with the Mayor or the President

of the County Council[10] by the 99th day before the general election.  § 7-104(b).  The

petition is then forwarded to the Baltimore City Board of Elections ("City Board"), § 6-

205(a), which must process it within 20 days, § 6-210(c)(1).

     During that time period, the City Election Director, who is the chief election official

for the City Board,[11] reviews the legal sufficiency of the petition and determines whether

the subject matter of the proposed charter amendment would be unconstitutional or would

be otherwise prohibited by law.[12]  § 6-206(c)(5).  If the City Election Director "determines

that a petition has satisfied all requirements established by law relating to that petition,"

the City Election Director "shall certify that the petition process has been completed" and

---

[9] The State Board is required to adopt regulations that, among other things, prescribe the form and content of petitions, specific procedures for the circulation of petitions for signatures and the verification and counting of signatures, and guidelines and instructions relating to the petition process.  EL § 6-103.

[10] *See* Md. Const. Art. XI-A, § 5.

[11] The chief election official of a local board of elections is the Election Director. EL § 2-206(7).  The chief election official of the State Board is the State Administrator. § 2-103(b)(9).

[12] In undertaking this legal review, the chief election official must seek "the advice of the legal authority."  § 6-206(c)(5).  Under Title 6, "legal authority" means: "(1) the Attorney General; or (2) as to a local petition, the counsel to the local board appointed under § 2-205 of this article for that county."  § 6-101(f).

shall certify that the "question has qualified to be placed on the ballot[.]" § 6-208(c). Conversely, if the City Election Director determines that a petition suffers from a deficiency, such as the legal impermissibility of a proposed charter amendment, the Election Director must "declare that the petition is deficient" and reject the ballot question. § 6-206(c).

The Election Law Article establishes a right to judicial review of the City Election Director's decision. Any "person aggrieved by a determination made" by the City Election Director, § 6-209(a), may seek judicial review within 10 days of the determination, or the 69th day before the election, whichever is earlier, § 6-210(e)(1)–(2). A registered voter may also seek declaratory relief "as to any petition[.]" § 6-209(b). The circuit court must hear the case on an expedited basis. § 6-210(e)(3). An expedited direct appeal to this Court is available from the circuit court's decision. §§ 6-209(a)(3)(ii), 6-210(e)(3)(i)(2).

In the case of either a proposed charter amendment that is initiated by the legislative body or by a citizen petition, once the charter amendment ballot question has been: (1) drafted; (2) qualified; and (3) certified—all of which occurs at the local government level— it then moves to the State Board for inclusion on the general election ballot.

### 4. The State Board's Certification of the "Content and Arrangement" of the General Election Ballot

In contrast to the State Board's lack of a role in the qualification and certification of individual charter amendment ballot questions described above, the Board has the general responsibility to certify the "content and arrangement" of the ballots to be used in every election. § 9-202(a). The State Board's "content and arrangement" certification relates to

9

its duties in placing the qualified and certified ballot questions and candidates who are running for office on the ballot. *Id.* Ballot "content" consists of (1) a heading at the top of the ballot; (2) a statement of each qualified question; (3) the title of each office in the election; (4) the names of each candidate certified to run for each office in the election; (5) each candidate's party designation; (6) space for a voter to cast a write-in vote for each office; and (7) instructions for completing the ballot. § 9-205. Ballot "arrangement" refers to the ordering of candidates and questions in accordance with the organizational rubric provided in §§ 9-210 and 9-211.

The State Board must certify the "content and arrangement" of the ballot "at least 64 days" before the general election. § 9-207(a)(2). On the same day as certification, the State Board must also publicly display the final "content and arrangement of each certified ballot on its website." § 9-207 (c). After three days of public display, the State Board is authorized to begin printing the ballot for use in the public election. § 9-207(e).

Errors in the "content and arrangement" of a ballot may be addressed in one of two ways. An error can be communicated to the State Administrator within two days of ballot certification and fixed by internal processes. § 9-207(d); *see also* § 9-209(c) (providing for judicial review of the State Administrator's decision to not correct a noted administrative error). Alternatively, "a registered voter may seek judicial review of the content and arrangement" of the ballot, "or to correct any administrative error, by filing a sworn petition" in the Circuit Court for Anne Arundel County within two days of certification. § 9-209(a). The circuit court may afford relief by: (1) correcting the "administrative error"

10

on its own; (2) issuing a show cause order as to why an "administrative error" should not be corrected; or (3) "tak[ing] any other action required to provide appropriate relief." § 9-209(b). Judicial review of the ballot may not be initiated, however, after the 62nd day before the election. § 9-209(c).

### 5. *Some Other Ballot Requirements Generally*

Aside from specific statutory provisions that govern the content and arrangement of the ballot, other provisions in Subtitle 2 of Title 9 establish additional ballot requirements. For example, ballots used in an election must be "as uniform as possible," § 9-204(a), with absentee and provisional ballots mirroring the content of their polling place counterparts, § 9-213. Paper ballots must be printed "in plain, clear type in black ink[.]" § 9-215(a)(1). And local boards must ensure that the supply of ballots meets the needs of the registered voters in their local jurisdiction. § 9-215(b). Finally, § 9-203 imposes normative benchmarks for ballots, mandating that "[e]ach ballot shall:"

    (1) be easily understandable by voters;
    (2) present all candidates and questions in a fair and nondiscriminatory manner;
    (3) permit the voter to easily record a vote on questions and on the voter's choices among candidates;
    (4) protect the secrecy of each voter's choices; and
    (5) facilitate the accurate tabulation of the choices of the voters.

### 6. *The "Catchall" Judicial Review Provision—EL § 12-202*

As discussed above, the General Assembly has provided for judicial review of certain election-related decisions, such as: (1) the City Election Director's final determination concerning the qualification (or lack thereof) of a legislatively initiated charter amendment

11

ballot question, *see* § 6-209; and (2) the State Board's certification of the "content and arrangement" of a ballot, *see* § 9-209. The General Assembly has also established a catchall judicial review provision where "no other timely and adequate remedy is provided" in the Election Law Article. Specifically, § 12-202 states, in pertinent part:

> (a) If no other timely and adequate remedy is provided by this article, a registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:
>
>> (1) is inconsistent with this article or other law applicable to the elections process; and
>> (2) may change or has changed the outcome of the election.
>
> (b) A registered voter may seek judicial relief under this section in the appropriate circuit court within the earlier of:
>
>> (1) 10 days after the act or omission or the date the act or omission became known to the petitioner . . . .

*7. Some Statutory Election Deadlines*

As noted above, a multitude of late-summer deadlines govern the submission and certification of ballot questions.[13] Of course, the State Board cannot certify the "content and arrangement" of the general election ballot until all of these deadlines and their

_____

[13] In addition to some of the other ballot election deadlines described herein, there are additional deadlines relating specifically to the posting and circulation of charter amendment questions. Once the text of each ballot question has been certified, it must be "posted or available for public inspection in the office of the State Board and each applicable local board for 65 days prior to the general election." § 7-105(d)(1). Additionally, the local board must affirmatively notify voters of ballot questions posed in their resident jurisdictions by mailing a specimen ballot at least one week before election day, or by conducting a mass communication campaign during the three weeks before election day. § 7-105(a).

associated periods for judicial review have passed. Other competing federal and state statutory deadlines place additional constraints on the State Board's finalization of the ballot. *See* 52 U.S.C. § 20302(a)(8)(A) (requiring mail-in ballots to be transmitted to certain qualified voters "not later than 45 days before the election"); *cf.* EL § 9-306(c)(1) (requiring that mail-in ballots be transmitted to qualified voters in the State "[n]ot later than 43 days before an election"). With the various competing statutory deadlines—which commenced on September 6, 2024, for the 2024 general election—the State Board had a 15-day window in which to design, print, and assemble approximately 500,000 mail-in ballots.

Within the context of this statutory background, we turn to the specific provision of the Baltimore City Charter that is the subject of this matter. In doing so, it is useful to provide some history with respect to its purpose, origin, and subsequent amendments.

### C. Article I, § 9 of the Baltimore City Charter

#### 1. Some History—Modern Development of Baltimore's Inner Harbor

Baltimore's Inner Harbor was a major United States seaport in the 1800s. However, because it was too shallow for large ships or heavy industry, the harbor was an industrial, working waterfront, mainly used for shipbuilding and oyster canning. In 1904, most of Baltimore's downtown was destroyed by the "Great Baltimore Fire." Suzanne Ellery Chappelle, et al., Maryland: A History 181 (2d ed. 2018). The Inner Harbor survived, and it was developed for industrial uses in the 1940s.

13

Starting in the 1950s and continuing into the 1960s, the Inner Harbor became increasingly marked by abandoned and neglected properties. Vacant and deteriorating warehouses and piers were converted to substandard housing. The area experienced crime, pollution, and overcrowding. *Id.* at 262–63. After initial urban renewal attempts to address the crisis by "tearing down slum housing" failed, *id.* at 263, governmental and private sector parties sought to find other approaches, *id.* at 266. A group of local businessmen founded the Greater Baltimore Committee in 1955. *Id.* "The committee collected financial resources, hired an urban planner, and began to define its objectives."[14] *Id.* Specifically, the committee sought "to restore Baltimore's port to a prominent place in the nation's economy[,]" "construct a new civic center[,]" and develop "a more comprehensive plan for urban renewal." *Id.* These efforts resulted in the redevelopment of the Inner Harbor, including the opening of the National Aquarium, the Maryland Science

---

[14] In 1963, Mayor Theodore McKeldin—at the start of his second non-consecutive term as Baltimore's Mayor (after he had served two terms as Maryland's governor in the 1950s)—"announced an even larger plan to revitalize Baltimore's inner harbor." Suzanne Ellery Chappelle, et al., Maryland: A History 267 (2d ed. 2018). In his inaugural address on May 21 of that year, Mayor McKeldin said:

> Envision with me, too, a new Inner Harbor area, where the imagination of man can take advantage of a rare gift of Nature to produce an enthralling panorama of office buildings, parks, high-rise apartments and marinas. In this we have a very special opportunity, for few other cities in the world have been blessed, as has ours, with such a potentially beautiful harbor area within the very heart of downtown.

https://perma.cc/BW6D-NTFV.

Center, and the Harborplace pavilions—which consist of two two-story buildings known as the Light Street Pavilion and Pratt Street Pavilion that house shops and restaurants.

## 2. *Initial Passage of Charter Amendment and Subsequent Amendment*

The above-described Inner Harbor redevelopment was achieved, in part, as the result of a charter amendment that was passed by the Baltimore City Council in 1978 as Resolution No. 11 (Council No. 1748) and ratified by the Baltimore City voters, which dedicated an area of approximately 33 acres[15] around the Inner Harbor for "public park uses[,]" but excluded 3.2 acres that were set aside for "eating places and other commercial uses" located to the north of Conway Street, and 3.4 acres that were set aside for the Maryland Science Center.[16]

In 2016, the Mayor and City Council adopted Resolution 16-029 (Council Bill 16-0660), which proposed a charter amendment to Article I, § 9 to expand the area in the Inner

---

[15] The Charter provision that was ultimately ratified by the voters describes the area of Inner Harbor Park by a metes and bounds description, but it does not identify the acreage of the area. According to newspaper articles, the total acreage described in Article I, § 9 of the Baltimore City Charter is approximately 33 acres. *See, e.g.*, Mark Reutter, *The Future of Baltimore's Harborplace*, BaltimoreBrew (Nov. 4, 2023, 8:49 AM), https://perma.cc/U5UH-RZTS.

[16] The 1978 Resolution No. 11 (Council No. 1748) that was ratified by the Baltimore City voters added a new Baltimore City Charter provision to Article I, which read as follows:

Section 11. Inner Harbor Park.

There is hereby dedicated to public park uses for the benefit of this and future generations of the City of Baltimore and the State of Maryland the portion of the City that lies along the north, west and south shores of the Inner Harbor,

Harbor where "outdoor eating places" could be located. The charter amendment was proposed to permit the construction of two outdoor cafes—one at Rash Field and the other at West Shore Park. The amendment was ratified by the voters in the 2016 general election.

*3. 2024 Legislation to Facilitate Harborplace Redevelopment*

Over the past decade, the pavilions at Harborplace have become mostly vacant. After Harborplace's prior owner defaulted on its mortgage, Harborplace was put into a court-appointed receivership in May 2019. MCB reached an agreement to acquire Harborplace in April 2022, and the Circuit Court for Baltimore City approved the sale of Harborplace to MCB in December 2022. MCB plans to redevelop Harborplace for mixed uses, consisting of retail and commercial buildings, as well as residential dwelling units.

Members of the City Council introduced three legislative bills in October 2023 to enable the redevelopment of Harborplace. Specifically, two of the bills proposed to modify the zoning that applies to the area including Inner Harbor Park.[17] The third bill—Bill No.

---

south of Pratt Street to the water's edge, east of Light Street to the water's edge and north of Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor to and including Rash Field, except that, in order to provide eating places and other commercial uses, areas totaling not more than 3.2 acres plus access thereto, within the dedicated space and north of an easterly extension of the south side of Conway Street shall be set aside for such purposes; and except that an area of not more than 3.4 acres shall be set aside for use by the Maryland Science Center, plus access thereto.

[17] Bill 23-0446 (Ordinance No. 34-319) removed the height restriction in the C-5-IH Inner Harbor Subdistrict. Bill 23-0448 (Ordinance 23-320) amended certain development restrictions, controls, and procedures in the Urban Renewal Plan for Inner Harbor Project I, including changing the use designation in certain development parcels under the Urban Renewal Plan.

23-0444 ("Charter Bill")—proposed a charter amendment to modify Article I, § 9 of the Baltimore City Charter in two respects. First, it would add "multi-family dwellings and off-street parking" to the existing "eating places[] and other commercial uses" that are currently permitted in the 3.2-acre area located to the north of Conway Street. Second, it would increase the area in which these uses are permitted from 3.2 acres to 4.5 acres.

These three bills were introduced on the same day and considered as companion legislation by the Mayor and City Council, the Planning Commission, and the various Departments who considered them and provided comments.[18] The Baltimore City Planning Commission considered the proposed legislation at its regular meeting on December 21, 2023, and the Baltimore City Economic and Community Development Committee held a public hearing on the bills on February 13, 2024.[19] The Baltimore City Council passed all three bills on March 4, 2024, and they were approved for form and legal sufficiency by the Chief Solicitor on March 12. As enacted, the purpose paragraph of the Charter Bill read as follows:

> FOR the purpose of amending the provision dedicating for public park uses the portion of the City that lies along the north west and south shores of the

---

[18] The Charter Bill file includes written recommendations and comments from the Baltimore City Department of Recreation and Parks, the Baltimore City Department of Transportation, the Baltimore Development Corporation, the Baltimore City Department of Housing & Community Development, and the Baltimore City Office of Equity and Civil Rights.

[19] The Hearing Notes for Bills 23-0444, 23-0446, and 23-0448 reflect that the Baltimore City Economic and Community Development Committee held a hearing on these proposed bills on February 13, 2024, which started at 2:30 p.m. and ended at 6:30 p.m. There were approximately 140 attendees. The attendance sheet is also part of the record. The Committee received both written and in-person testimony.

Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge, and north of Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor and including Rash Field to permit multifamily residential development of off-street parking within the dedicated boundaries of Inner Harbor Park, but making clear that areas used for multi-family dwellings and off-street parking are not part of the area dedicated as park land for public benefit; and submitting this amendment to the qualified voters of the City for adoption or rejection.

(Stricken text and underlining omitted). Section 1 of the Charter Bill reflected the manner in which Article I, § 9 of the Charter would be amended if ratified by the voters, reflecting the language to be removed in brackets, and the language to be added in all-caps and underlined text as follows:

### § 9. Inner Harbor Park.

There is hereby dedicated to public park uses for the benefit of this and future generations of the City of Baltimore and the State of Maryland the portion of the City that lies along the north, west and south shores of the Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge and north of Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor to and including Rash Field, except that, [in order] to provide MULTI-FAMILY DWELLINGS AND OFF-STREET PARKING, eating places, [and] other commercial uses, MULTI-FAMILY DWELLINGS, AND OFF-STREET PARKING; areas totalling not more than [3.2] 4.5 acres plus access thereto, within the dedicated space and north of an easterly extension of the south side of Conway Street shall be set aside for such purposes; [purposes:] PURPOSES, EXCEPT THAT ANY AREAS USED FOR MULTI-FAMILY DWELLINGS AND OFF-STREET PARKING ARE NOT DEDICATED AS A PUBLIC PARK; and except that in order to provide outdoor eating places for the areas known as West Shore Park and Rash Field, areas totalling not more than 0.5 acres within the dedicated space and south of an easterly extension of the south side of Conway Street shall be set aside for such purposes; and except that an area of not more than 3.4 acres shall be set aside for use by the Maryland Science Center, plus access thereto.

Section 3 of the Charter Bill stated that the proposed charter amendment would "be submitted to the legal and qualified voters of Baltimore City, for adoption or rejection, in accordance with Article XI-A, § 5 of the Maryland Constitution, in the form specified by the City Solicitor."

One month later, on April 19, 2024, Mr. Ambridge contacted the Chief Solicitor of the City Law Department by email. Mr. Ambridge asked to review the language of the ballot question and to be permitted to suggest changes or edits to that language before the question was "sent to [the] State for Certification." Having received no response, Mr. Ambridge followed up on May 13 with a second email requesting an opportunity to "weigh[] in on the short title of the referendum before it is sent to [the] State Board of Election." The Chief Solicitor responded that same day and declined input from "any group or individual other than those required by the law."

Mr. Ambridge emailed the Office of the Attorney General on July 16 to make the same request for an opportunity to review the ballot question language "before it is sent to [the] State Board of Elections for Certification[.]" Two days later, Mr. Ambridge forwarded that email to the State Board's assigned assistant attorney general and requested acknowledgement that the email had been received. The State Board's attorney acknowledged his personal receipt of the email.

### 4. *Question F*

On August 2, 2024, the City Solicitor transmitted to the State Board a letter certifying the language of the ballot question in accordance with § 7-103(c)(3)(i). The

19

letter noted that it "provided the form in which the proposed amendment is to be submitted to the voters (which has been drafted and approved by the Department of Law)." It identified the question as "Question F" and read as follows:

QUESTION F
CHARTER AMENDMENT
**INNER HARBOR PARK**

Question F is for the purpose of amending the provision dedicating for public park uses the portion of the city that lies along the Northwest and South Shores of the Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge, and north of the highway[20] to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor including Rash Field with a maximum of 4.5 acres north of an easterly extension of the south side of Conway Street plus access thereto to be used for eating places, commercial uses, multifamily residential development and off-street parking with the areas used for multifamily dwellings and off-street parking as excluded from the area dedicated as a public park or for public benefit.

The City Solicitor attached to the certification letter a certified true test copy of the Charter Bill and provided courtesy copies of the letter to multiple public officials, including the Mayor of Baltimore, the Attorney General, and the Chief Solicitor of the City Law Department.

On September 2, 2024, the State Board posted to its website the final content and arrangement of all ballots to be used in the 2024 general election. This included the general election ballot for Baltimore City, which presented Question F.

---

[20] The version of Question F that was submitted to the State Board on August 2, 2024, did not include the word "Key" before "highway." After the City Solicitor transmitted the question, that office confirmed with the State Board that the word "Key" should be added.

## II

## Procedural History

On September 5, 2024, Mr. Ambridge filed a petition for judicial review in the Circuit Court for Anne Arundel County seeking review of the State Board's "certification of Ballot Question 'F' in the 2024 General Election Ballot for Baltimore City, dated September 2, 2024." The initial petition was filed pursuant to § 9-209(a), which authorizes challenges to the "content and arrangement, or to correct any administrative error" on the ballot. Mr. Ambridge amended his petition on September 6 to add the 22 additional petitioners. On September 9, Mr. Ambridge and the other petitioners amended the petition to include a challenge under § 12-202(a), which authorizes a registered voter to "seek judicial relief from any act or omission relating to an election," but only "[i]f no other timely and adequate remedy is provided by" the Election Law Article.[21]

Mr. Ambridge filed a Memorandum in Support of his Petitions for Judicial Review on September 10, which set forth the substance of his challenge for the first time. In his Memorandum, Mr. Ambridge argued that Question F was "improper charter material" under this Court's case law and was therefore unconstitutional. Even if the ballot question survived the constitutional challenge, Mr. Ambridge asserted the language as drafted did

---

[21] In addition to filing the petitions for judicial review in the Circuit Court for Anne Arundel County, on September 12, 2024, Mr. Ambridge also filed a petition for judicial review in the Circuit Court for Baltimore City. In the Baltimore City case, Mr. Ambridge asserted the same constitutional challenge to Question F, and sought injunctive and declaratory relief to enjoin the question from appearing on the ballot. On November 11, 2024, the Circuit Court for Baltimore City entered an order dismissing that case as moot. *See* Circuit Court for Baltimore City, Case No. C-24-CV-24-002707.

not satisfy the minimum standards of reasonable clarity, accuracy, and completeness required under our case law. Mr. Ambridge asserted that the circuit court had the authority under §§ 9-209(b)(3) and 12-202(a)(1) to invalidate Question F as being incompatible with the Maryland Constitution and with settled precedent. Alternatively, Mr. Ambridge contended that, "[a]t a minimum," Question F "must be returned to the City Solicitor and the State Board of Elections to accord them an opportunity to correct the deficient formulation they have certified and published."

The State Board—at the time the sole respondent—responded to the petition on September 13 and sought dismissal of the petition on procedural grounds. First, the State Board argued that the statutory provisions of § 9-209(a), which authorize judicial review of a ballot's "content and arrangement," do not encompass substantive challenges to the legality of a ballot question. Specifically, the State Board asserted that Mr. Ambridge's efforts to challenge the ballot question's legal sufficiency under § 9-209 were misplaced because the State Board was not involved in drafting or reviewing the ballot question, and it had no legal responsibility to do so.

Second, with respect to Mr. Ambridge's challenge under § 12-202, the State Board argued that the doctrine of laches barred consideration of Mr. Ambridge's claims because, under the statute, a claim must be filed within "10 days after the act or omission or the date the act or omission became known to the petitioner." The State Board noted that the charter amendment question "qualified" for inclusion on the general election ballot in March 2024, when the Mayor and Council enacted the Charter Bill, and that it was undisputed that Mr.

22

Ambridge had knowledge of the Charter Bill as of April 19. According to the State Board, any substantive challenge to the charter amendment on the basis that it was not suitable "charter material" was required to be filed no later than 10 days from April 19—the date upon which Mr. Ambridge undisputedly had knowledge that the ballot amendment would be submitted to the voters on the upcoming election ballot.

The circuit court held a hearing on September 16 and ruled from the bench in Mr. Ambridge's favor. The circuit court issued a memorandum opinion and order the following day. The circuit court rejected all of the State Board's procedural arguments. First, the court ruled that laches did not bar the claim brought under § 12-202. The court determined that, for purposes of § 12-202, the "act or omission" giving rise to both of Mr. Ambridge's claims—improper charter material and unclear ballot language—occurred when the State Board publicly displayed the general election ballot on September 2. Accordingly, the court ruled that Mr. Ambridge's initiation of a suit under § 12-202 on September 9 did not reflect an unreasonable delay.

Second, the court ruled that Mr. Ambridge's substantive claims could also be filed under § 9-209. The court reasoned that the provisions of § 9-205(2) require the State Board to ensure that every ballot question certified to it meets every applicable legal standard. The circuit court observed that § 9-203 "sets forth the standard by which [a] ballot question is judged." Therefore, reasoned the court, a ballot's "content" encompasses whether qualified questions meet the standards set forth in § 9-203, including the directive that the

23

ballot be "easily understandable by voters" and "present all candidates and questions in a fair and nondiscriminatory manner."

Turning to the merits, the court ruled that the charter amendment proposed in Question F was a "final rezoning scheme of legislative character[,]" was not proper charter material, and therefore violated Article XI-A, § 3 of the Maryland Constitution. The court stated that the language of Question F would leave "little, if any, discretion to" the City Council to exercise its legislative authority pursuant to Article XI-A, § 3, and that the language "does not touch the fundamental character of 'form and structure' of government as is properly reserved for charter amendments proposed to the electorate under Article XI-A, § 5." The court concluded that "by proposing a final rezoning scheme of legislative character of Inner Harbor Park directly to the electorate of Baltimore City, the proposed charter amendment contravenes the Maryland Constitution and established Maryland Supreme Court precedent and is therefore unconstitutional."

Finally, the circuit court reviewed the question's language and found it wanting under the standard articulated by this Court in *Stop Slots Md. 2008 v. State Board of Elections*, 424 Md. 163 (2012). Specifically, the court found that the language was "not easily understandable and does not fairly apprise voters of the nature of the question[.]" The court determined that the descriptive metes and bounds language was "unnecessary verbiage[,]" and that the language did not sufficiently "apprise the voters of the Charter section and the proposed amendment's effect on what already exists."

24

In addressing the appropriate remedy, the court acknowledged that revising the general election ballot could not address Question F's shortcoming as improper "charter material," nor would it be feasible at this late date in the election calendar. The court ordered a post-election remedy directing the City Board to "not certify the results of Ballot Question 'F[.]'"

On September 19, 2024, the City and MCB filed motions to intervene. Following a hearing, the circuit court granted both motions. The State Board, City, and MCB each noted an appeal.

### III

### Standard of Review

We conduct a de novo review of the circuit court's interpretation of the Maryland Constitution, the Election Law Article, and our case law. *Ademiluyi v. Md. State Bd. of Elections*, 458 Md. 1, 29 (2018). Our review of the circuit court's decision with respect to the equitable doctrine of laches is a mixed question of fact and law. *Liddy v. Lamone*, 398 Md. 233, 245 (2007). The issue of whether the elements of laches have been established is a question of fact. *Id.* at 245–46. However, the issue of whether, in view of the established facts, laches should be invoked is a question of law. *Id.* at 246–47. In *Liddy*, we explained that, although we ordinarily apply a deferential standard of review to mixed questions of law and fact where we are reviewing an administrative agency's decision involving the agency's expertise, the de novo standard is appropriate where we are reviewing the trial court's decision involving a mixed question of law and fact. *Id.* at 248. "Accordingly, where the issue is whether a party is precluded by laches from challenging

25

an action of another party, we shall review the trial court's ultimate determination of the issue *de novo*, just as we do in similar circumstances." *Id.* at 248–49; *see also Ademiluyi*, 458 Md. at 29; *Lamone v. Schlakman*, 451 Md. 468, 480 (2017).

**IV**

**Discussion**

On direct appeal to this Court, the State Board, MCB, and the City all assert that the circuit court erred in ruling that: (1) Mr. Ambridge's claims could be brought under § 9-209(a); and (2) the claims under § 12-202 were not barred by laches. Turning to the circuit court's substantive rulings, MCB and the City assert that the circuit court also erred by finding that Question F: (1) was not proper "charter material" and was therefore unconstitutional, and (2) did not satisfy the standards set forth in the Election Law Article and our case law regarding challenges to a ballot question's language and clarity.[22] Mr. Ambridge asserts that the circuit court correctly ruled on each of these issues.

**A.** ***EL § 9-209(a) Is Not An Appropriate Vehicle for Substantive Challenges to a Proposed Charter Amendment or Challenges to the Ballot Language that is Drafted by the City Solicitor***

We first discuss our holding that Mr. Ambridge's election challenges to the substance of the ballot question, as well as the understandability of the language of the

---

[22] Consistent with its position that it has no substantive role or interest in this case, the State Board takes no position on these two issues.

ballot question, could not be brought under EL § 9-209(a).  In doing so, we turn to our traditional canons of statutory interpretation to examine the statute in question.

Our ultimate objective "is to extract and effectuate the actual intent of the Legislature in enacting the statute." *Goshen Run Homeowners Ass'n v. Cisneros*, 467 Md. 74, 107 (2020) (quoting *Reier v. State Dep't Assessments & Tax'n*, 397 Md. 2, 26 (2007)).  The starting point of the statutory analysis is the plain language of the statute, which we view in the context of the statutory scheme to which it belongs. *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024); *see also Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021).  "Our review of the text is wholistic, seeking to give effect to all of what the General Assembly included and not to add anything that the General Assembly omitted." *Westminster Mgmt., LLC*, 486 Md. at 644.  "In our analysis of statutory text, we therefore take the language as we find it, neither adding to nor deleting from it; we avoid 'forced or subtle interpretations'; and we avoid constructions that would negate portions of the language or render them meaningless." *Id.* (quoting *Wheeling v. Selene Fin. LP*, 473 Md. 356, 377 (2021)); *see also Lockshin v. Semsker*, 412 Md. 257, 275 (2010); *Koste v. Town of Oxford*, 431 Md. 14, 25–26 (2013).  "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resorting to other rules of construction." *Wheeling*, 473 Md. at 377 (quoting *Lockshin*, 412 Md. at 275).

"Presuming the General Assembly 'intends its enactments to operate together as a consistent and harmonious body of law,' we also 'seek to reconcile and harmonize the parts

27

of a statute, to the extent possible consistent with the statute's object and scope.'" *Westminster Mgmt.*, 486 Md. at 644–45 (quoting *Wheeling*, 473 Md. at 377). Finally, "[i]n every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Wheeling*, 473 Md. at 377 (quoting *Lockshin*, 412 Md. at 276).

The State Board, City, and MCB, all assert that Mr. Ambridge could not file a petition for judicial review under § 9-209 under the plain language of the statute, as well as this Court's case law interpreting the same. Specifically, they assert that the judicial review authorized by § 9-209(a) is limited—it only authorizes a voter to "seek judicial review of the content and arrangement, or to correct any administrative error" on the ballot. The Appellants argue that judicial review under § 9-209(a) does not extend to substantive challenges to a candidate's or question's eligibility to be on the ballot. The Appellants also rely upon *Ross v. State Board of Elections*, 387 Md. 649 (2005), in which this Court held that a petitioner could not challenge a candidate's qualifications to be included on a ballot under § 9-209(a). The Appellants further assert that § 9-209(a) does not authorize judicial review of the understandability or clarity of the language of a charter amendment ballot question because the State Board has no legal duty to draft it or review it.

Mr. Ambridge disagrees and argues that he has a right to seek judicial review under § 9-209(a) for both of his substance challenges—the constitutionality of Question F's subject matter and the readability of the ballot question's language. He asserts that his right to judicial review under § 9-209(a) arises from two separate sections in Subtitle 2: (1)

28

§ 9-203(1), which requires that "[e]ach ballot" "be easily understandable by voters;" and (2) § 9-205(2) of the ballot "content" provisions, specifying that each ballot contain "a statement of each question that has met all of the qualifications to appear on the ballot[.]" Because § 9-209(a) provides for a right of judicial review of the State Board's general certification of the "content" of a ballot, Mr. Ambridge asserts that the ballot requirements contained in §§ 9-203(1) and 9-205(2) provide a statutory basis for his challenges to the constitutionality and readability of Question F. As for the assertion that Question F is not proper "charter material," Mr. Ambridge also asserts that *Ross* has no application here because that case involved a challenge to a candidate's qualification and not a challenge to the substance of a ballot question. For several reasons, we disagree with Mr. Ambridge's expansive interpretation of § 9-209(a).

Section 9-209(a) states:

Within 2 days after the content and arrangement of the ballot are certified under § 9-207 of this subtitle, a registered voter may seek judicial review of the content and arrangement, or to correct any administrative error, by filing a sworn petition with the Circuit Court for Anne Arundel County.

Subsection (b) states:

The circuit court may require the State Board to:

(1) correct an administrative error;
(2) show cause why an administrative error should not be corrected; or
(3) take any other action required to provide appropriate relief.

Starting with the plain language, § 9-209(a) limits judicial review under that section only to the "content and arrangement, or to correct any administrative error" of a ballot that has been certified by the State Board in connection with its duties under Subtitle 2 of Title 9.

29

The phrase "content and arrangement" first appears in Subtitle 2 in connection with the State Board's duty to certify the ballot. Specifically, the State Board is required to "certify the content and the arrangement of each ballot to be used in an election that is subject to this article." § 9-202(a). The Board's duties related to the ballot's "content" are set forth in § 9-205, and its duties pertaining to "arrangement" are set forth in § 9-206 (format of ballot contents), § 9-210 (arrangement of candidates and offices), and § 9-211 (arrangement of ballot questions).[23]

With respect to "content," § 9-205 provides that "[e]ach ballot shall contain:" (1) a heading; (2) "a statement of each question that has met all of the qualifications to appear on the ballot;" (3) "the title of each office to be voted on;" (4) the name "of each candidate who has been certified by the State Board;" (5) a candidate's party designation for certain

---

[23] Because Mr. Ambridge has not asserted any challenge with respect to Question F's arrangement on the ballot, we do not need to discuss the State Board's "arrangement" duties in any detail other than to note that EL § 9-206 outlines the general format provisions that govern a ballot's arrangement, including items such as a heading denoting that it is the "Official Ballot[,]" specification of the type of election, such as a primary election or a general election, the date of the election, the words "State of Maryland," and the name of the county to which the ballot pertains. Section 9-210 prescribes the arrangement of candidates for whom a voter may cast a vote, including details such as: the order of placement for various public offices upon which a voter is asked to cast a ballot; the identity of each candidate who has qualified for placement on the ballot; the number of candidates for whom a voter may lawfully vote; the ordering of one or more candidates listed in alphabetical order by surname; and the acceptable number of rows or columns permitted. Section 9-211 specifies the order in which ballot questions must appear, with those relating to the State Constitution or amendments to the State Constitution appearing first, followed by those relating to enactments of the General Assembly, and followed by those relating to charter amendments.

candidates; (6) the "means by which a voter may cast write-in votes"; and (7) instructions to voters.

When viewing the plain language of the terms "content and arrangement" within the statutory scheme, it is clear these terms relate solely to judicial review of the State Board's administrative duties to assemble a ballot's content and to ensure the proper arrangement or placement of questions and candidates on the ballot consistent with administrative or procedural requirements that are set forth in Subtitle 2 of Title 9.

As discussed *supra*, the State Board has no duties or responsibilities related to the certification of the substance of the charter amendment ballot question as being permitted by law, nor does it have any responsibility for drafting the ballot language. Under the express provisions of the Election Law Article, a charter amendment proposed by the legislative body of a charter county or Baltimore City *automatically qualifies* for inclusion on a ballot upon the adoption of the legislative resolution proposing the amendment. *See* § 7-102(c)(3)(i). Once the charter amendment ballot question is "qualified" for inclusion on the ballot, the City Law Department is required to draft the text of the ballot question, and to certify it to the State Board no later than the 95th day before the election. *See* § 7-103(c)(3)(i). After the City Law Department certifies the ballot question to the State Board, the Board's statutory duties are limited to the administrative task of placing the charter amendment ballot question as certified by the City Law Department on the ballot. In other words, the State Board is required to place "a statement of each question that has met all of the qualifications to appear on the ballot[,]" *see* § 9-205(2), as that language is drafted

31

by the City Law Department, and "arrange" it on the ballot in accordance with the statutory list or priority of particular types of ballot questions, *see* § 9-211 (specifying the priority of placement of various types of ballot questions).

The type and nature of the relief that the circuit court may provide also supports our interpretation. Specifically, § 9-209(b) states that "[t]he circuit court may require the *State Board* to: (1) correct an *administrative error*; (2) show cause why an *administrative error* should not be corrected; or (3) take any other action required to provide appropriate relief." (Emphasis added). First, the relief is directed to the *State Board*—an entity that has no legal duty or authority to either review the substance of or draft a legislatively initiated charter amendment ballot question. It would be illogical to impose upon the State Board an obligation to provide relief where there is no concomitant duty or obligation. Second, the focus of the relief is on the correction of an "*administrative*" error—i.e., relief that *is* consistent with the Board's duties under Subtitle 2.

Under the plain language of the statute, judicial review under § 9-209(a) is limited to the "content" or "arrangement" of the ballot, as those duties are described by statute, and the relief is limited to the correction of "administrative errors."[24] Because the State Board

---

[24] To support his argument that § 9-209(b) authorizes the circuit court to order relief that is not similarly limited to the correction of "administrative errors," Mr. Ambridge directs us to the catchall relief provision in subparagraph (3), which authorizes the circuit court to "take any other action required to provide appropriate relief." Even if we were inclined to interpret this provision as broadly as Mr. Ambridge suggests, it still does not provide an avenue to challenge decisions and actions undertaken by the City Council and the City Law Department for which the State Board has no statutory responsibility or oversight. Under § 9-209, the circuit court's ability to provide relief is limited to requiring the "State Board" to

32

has no legal duty or authority to review the *substance* of a proposed charter amendment, nor the responsibility for drafting the ballot question or reviewing its language for understandability or clarity, it follows that the limited judicial review provided under § 9-209(a) has no application to the type of challenges Mr. Ambridge asserts here.

This is not the first time that this Court has considered whether § 9-209 authorizes judicial review of a substantive challenge concerning a matter on a ballot. In *Ross v. State Board of Elections*, 387 Md. 649, 653 (2005), we considered whether judicial review under § 9-209 was the appropriate vehicle for challenging a candidate's eligibility to remain on the ballot. In that case, a candidate sought to disqualify his electoral opponent based on alleged campaign finance violations. *Id.* at 654–56. The challenging candidate filed a petition for judicial review under § 9-209, alleging that his opponent should not have been certified for the ballot because of the alleged violations. *Id.* at 656–57. This Court disagreed and held that judicial review under § 9-209 was not the appropriate vehicle to challenge a candidate's eligibility for the ballot. *Id.* at 666–67.

This Court reviewed the statutory history of the predecessor statute, which was enacted in 1896, observing that its purpose was to "provid[e] for a private cause of action to correct errors contained on a ballot after inaction by the [State] Board[.]" *Id.* at 662–64. Turning to the plain language of the current statute, this Court explained that "[t]he errors subject to judicial review under Section 9-209, whether arising from the content and

undertake particular actions. The circuit court has no authority to order the State Board to take action that the State Board has no legal duty or authority to take.

33

arrangement of the ballot or other facial aspects of the ballot, are confined to the various characteristics of the ballot, not the qualifications or lack thereof of the candidates." *Id.* at 665. In other words, a challenge to the ballot is limited to the four corners of the ballot itself. We therefore concluded that the plain language of § 9-209 "does not provide a vehicle for a registered voter to challenge the candidate's underlying eligibility as determined by the State Board." *Id.* at 666. Instead, we concluded that judicial review under § 9-209 provided only "a mechanism by which such a voter may contest the inclusion of the name of a candidate who is not certified by the State Board or the exclusion of the name of one who is certified." *Id.* at 667. In other words, a circuit court reviewing "content and arrangement" could ask whether the ballot material at issue *was* qualified, not whether it *should have* qualified. The same analysis applies regardless of whether a voter is challenging whether a candidate or charter question qualifies for placement on a ballot. Section 9-209 authorizes judicial review to determine whether the State Board has complied with its statutory duties concerning the "various characteristics of the ballot" or other "facial aspects" of the ballot falling within the State Board's duties. *See id.* at 665.

Finally, we note that, after this Court's decision in *Ross*, the General Assembly added amendments consistent with our interpretation that judicial review under § 9-209(a) is limited to the correction of the State Board's administrative errors. During the 2019 Legislative Session, the General Assembly amended § 9-209(a) and (b)(1), by adding the

34

word "administrative" before "error."[25] 2019 Md. Laws, Ch. 770. The Fiscal and Policy Note explains that "[t]he bill modifies judicial review provisions relating to the content and arrangement of ballots so that they authorize judicial review to correct any *administrative* error, instead of any *other error.* Judicial review, in circumstances where an error is not corrected, is limited to review of an administrative error after ballots have been publicly displayed . . . ." (Emphasis in original). By amending the language to add the word "administrative" to the nature of relief and the type of relief that a court may order, the General Assembly foreclosed any attempt to interpret the statutory provision more broadly.

We also observe that there are at least three additional reasons that Mr. Ambridge's expansive interpretation of § 9-209(a) would lead to illogical, unsound, or untenable results that the General Assembly surely could not have intended.

*First*, if the Court were to conclude that the State Board's duties with respect to ballot "content" included determining the underlying legality of the substance of a ballot question, the effect would mean that the State Board—an executive agency—would be

---

[25] When *Ross v. State Board of Elections*, 387 Md. 649 (2005), was decided, former § 9-209 (2002) read, in pertinent part:

(a) Within 3 days after the content and arrangement of the ballot are placed on public display under § 9-207 of this subtitle, a registered voter may seek judicial review of the content and arrangement, or to correct any *other error*, by filing a sworn petition with the circuit court for the county.

(b) The circuit court may require the local board to:

(1) Correct *an error*; . . . .

(Emphasis added).

35

entrusted with the authority to review enactments by the State Legislature and county governments. Specifically, under Mr. Ambridge's expansive interpretation, the State Board would have the authority, as part of its responsibility to certify ballot "content," to nullify a Baltimore City Council resolution, *see* § 7-102(c)(3)(i), a charter board enactment, *see* § 7-102(c)(2), or a law passed by the Maryland General Assembly, *see* § 7-102(a)(3) and (e). It would also give the State Board the authority to revise questions drafted by the Secretary of State, County Attorney, or City Law Department depending on the nature of the ballot question, where no such authority exits.

*Second*, Mr. Ambridge's interpretation would give litigants who wish to raise a substantive challenge to a ballot question's eligibility two bites at the apple. For example, as discussed *supra*, for a citizen-initiated charter amendment arising from a petition filed under Article XI-A, § 5 of the Maryland Constitution, EL § 6-209 establishes a right to judicial review of the chief election official's decision to certify or not to certify a ballot question's placement on the ballot. Such a challenge must be brought "in the circuit court for the county in which the petition is filed." § 6-209(a)(1)(ii). Under Mr. Ambridge's interpretation of §§ 9-209(a) and 9-205(2), for questions reaching the ballot by petition, a litigant could first file a petition for judicial review in the Circuit Court for Baltimore City under § 6-209, contesting the determination made by the "chief election official" that the petition satisfied all applicable legal requirements. That same litigant, or any other registered voter, could then file an identical challenge to the same question in response to the State Board's later certification of the ballot's "content" under § 9-209 in the Circuit

36

Court for Anne Arundel County. The local board of elections and the State Board would face separate challenges to the same question, on the same grounds, in circuit courts in two different counties. The same would be true for ballot questions arising from an act of the General Assembly. *See, e.g.*, *Kelly v. Vote Know Coal. of Md.*, 331 Md. 164, 167 (1993) (reviewing a declaratory judgment action regarding whether language for a ballot question referring an act of the General Assembly to the voters was sufficiently clear and understandable). The General Assembly certainly did not intend to provide a second right of judicial review through the limited review provided in connection with the State Board's certification of the ballot "content."

*Third*, the timing of the judicial review provisions set forth in § 9-209(a) also support our interpretation that judicial review is limited to the correction of administrative errors arising from the State Board's administrative tasks under Subtitle 2. A judicial review proceeding must be filed within two days after the State Board certifies the "content and arrangement of the ballot"—the final step in the ballot preparation process before printing commences. It would be illogical to interpret the General Assembly's intent as allowing substantive challenges on such a belated and expedited timeframe to a candidate's or a ballot question's qualifications for inclusion on a ballot, or challenges to the ballot question's language, where that information is known or may be known several weeks or even months before the final ballot's certification. For example, a voter is on notice that a charter amendment ballot question will be presented to the voters upon the passage of the legislative resolution directing that it be submitted to the voters. Here, that notice occurred

37

on March 12, 2024—five months before the ballot question was certified. Additionally, a voter has the ability to ascertain the specific language of the ballot question at least 95 days prior to the general election—the statutory deadline by which the City Law Department was required to certify the question to the State Board. It would be illogical to interpret this provision as permitting substantive challenges to a charter amendment question or a challenge to a particular question's wording on the eve of a ballot's printing deadline when the information upon which a challenge could be brought is known, or could be known, weeks or months prior to that date.

In conclusion, we hold that the judicial review authorized by § 9-209(a) is intended to address administrative matters within the purview of the State Board's statutory duties related to a ballot's content and arrangement under Subtitle 2. The State Board has no duty or authority to review the substance of the ballot question, nor does it have any duty or authority to draft or review the charter amendment ballot question. Accordingly, § 9-209 is not a proper mechanism to challenge either whether a proposed charter amendment is proper charter material or whether the language of a proposed charter amendment comports with § 9-203(1).

### B. Mr. Ambridge's Claims Are Barred by the Doctrine of Laches

Mr. Ambridge had a right to seek judicial review under § 12-202(a), which provides a registered voter with the right to seek judicial review from a violation of law applicable to elections when "no other timely and adequate remedy is provided" by the Election Law Article. As noted above, Mr. Ambridge raised two substantive challenges to Question F—

first, that it was not proper "charter material" under this Court's case law and therefore violated Article XI-A of the Maryland Constitution, and second, that the question as drafted was not easily understandable by the voters and therefore violated § 9-203(1) and this Court's case law pertaining to a ballot question's understandability and clarity. For the reasons set forth below, we hold that review of both questions was barred by the doctrine of laches by the time Mr. Ambridge filed this action.

In an action for judicial review under § 12-202, the party seeking relief must prove four elements for each claimed violation of the Election Law Article: (1) the "absence" of another adequate remedy in the Article; (2) an "act or omission relating to an election"; (3) that the act or omission contravened a "law applicable to the elections process"; and (4) that the act or omission "may change or has changed the outcome" of an election. *Suessmann v. Lamone*, 383 Md. 697, 714 (2004) (quoting § 12-202(a)). The petitioner must file the action "in the appropriate circuit court" within 10 days of the challenged "act or omission or the date the act or omission became known to the petitioner[.]" § 12-202(b)(1). The 10-day deadline is not a traditional statutory limitations period. Rather, because § 12-202 creates a cause of action in equity, the 10-day filing period "provides a benchmark for the application of laches." *Lamone v. Schlakman*, 451 Md. 468, 485 (2017).

Laches is an affirmative, equitable defense against "stale" claims. *Liddy v. Lamone*, 398 Md. 233, 243–44 (2007) (quoting *Ross*, 397 Md. at 668). No bright-line rule exists to dictate when a defense of laches must apply; instead, the defense "must be determined by the facts and circumstances of each case." *Id.* at 244 (quoting *Ross*, 387 Md. at 669).

39

Laches bars an action when (1) there is "unreasonable delay" in asserting a claim, and (2) the plaintiff's delay causes prejudice to the defending party. *Id.* (quoting *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 117 (2000)).

The doctrine of laches "has particular import in the election context." *Trump v. Biden*, 951 N.W.2d 568, 572 (Wisc. 2020). In determining whether the petitioner acted with unreasonable delay, the court must consider whether the petitioner "had knowledge, *or the means of knowledge*, of the facts" underlying his or her cause of action. *Ademiluyi v. Egbuonu*, 466 Md. 80, 127–28 (2019) (emphasis added) (quoting *Parker v. Bd. of Election Supervisors*, 230 Md. 126, 131 (2019)). We have explained that, in the context of judicial challenges to elections, petitioners "have a certain duty to stay informed." *Id.* at 129 (citing *Abrams v. Lamone*, 398 Md. 146, 159 n.18 (2007)). Heightened "diligence and promptness are required in election-related matters, particularly where actionable election practices are discovered prior to the election." *Trump*, 951 N.W.2d at 572 (quoting 29 C.J.S. Elections § 459 (2020)). Such heightened diligence is important because "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990).

When evaluating the application of the laches doctrine in the election context, courts must also consider the potential harm to the electorate. As the United States Supreme Court has observed, "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

40

Accordingly, lower courts must be mindful of "considerations specific to election cases and [the courts'] own institutional procedures." *Id.* "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5.

We have repeatedly stressed that "any claim against a state electoral procedure must be expressed expeditiously" given the State's compelling interest in preserving the integrity of the election process. *Liddy*, 398 Md. at 245 (quoting *Ross*, 387 Md. at 671); *see also Schlakman*, 451 Md. at 488. Moreover, this Court has not hesitated to find that the elements of the doctrine have been satisfied as a matter of law where the challenger does not act expeditiously, and the petition is filed close in time to an election or after an election. *See, e.g.*, *Ross*, 387 Md. at 668–73 (laches barred an unsuccessful candidate's challenge to his opponent's qualifications when he was on notice of the successful candidate's committee's failure to file campaign finance reports prior to the election, and waited until three days after the general election to file the action); *Liddy*, 398 Md. at 250–55 (laches barred a petitioner's election challenge to a candidate's qualifications for the Office of Attorney General where the petitioner filed the petition 18 days before the general election, even though the petitioner was on notice of the alleged claim two months prior to filing); *Schlakman*, 451 Md. at 488–90 (laches barred a petition by candidates challenging their opponent's qualifications when they were on notice of the alleged claim at least three weeks prior to filing the petition and filed it only days before the scheduled mailing of

41

absentee ballots to military and oversees voters); *Ademiluyi*, 458 Md. at 39–47 (laches barred a petition filed by an unsuccessful candidate challenging the qualifications of a successful candidate where the petition was filed more than six months after the general election, and over a year after the challenger became aware of the facts that formed the basis for her election claims).

In each case in which we held that the challenge was barred by laches, we noted the prejudice to not only the election officials and the candidate who was the subject of the petition, but also to the electorate. For example, in *Liddy*, this Court held that the trial court "erred in not invoking the doctrine of laches as a bar to the [plaintiff's] untimely claim when it placed the determination of a candidate's eligibility ahead of the urgency of the election itself and the possible disenfranchisement of Maryland voters." 398 Md. at 249–50. We explained that permitting "challenges to be brought at such a late date would call into question the value and the quality of our entire elections process[,] and would only serve as a catalyst for future challenges. Such delayed challenges go to the core of our democratic system and cannot be tolerated." *Id.* at 255; *see also Ross*, 387 Md. at 672–73 (observing that, "[m]ost importantly," the petitioner's "actions also prejudiced the electorate as a whole by denying them the efficacy of their vote and undermining their faith in a free and fair election"). Given the importance of laches in the context of judicial challenges in election-related matters, this Court has applied the doctrine as an alternative holding even when it addressed the merits. *See Schlakman*, 451 Md. at 490.

42

*1. Mr. Ambridge's Action in Waiting Until September 5 To File the Petition Constituted Unreasonable Delay*

In this case, the circuit court found that Mr. Ambridge's challenge was timely and that there was no unreasonable delay. In so ruling, the court determined that the "act" giving rise to the petition under § 12-202(a) "was the act by the State Board of Elections, to wit: the certification and public display of Ballot Question 'F' on September 3, 2024." As for potential prejudice occasioned by the filing of the petition on the eve of ballot printing, the circuit court did not consider any possible prejudice to the City Council or the electorate. The court instead focused exclusively on possible prejudice to the State Board. Although the circuit court "acknowledge[d] that there may exist a prejudice to the State Board relating to reprinting of ballots or requiring explanatory language[,]" the court did "not find prejudice to the State Board of the degree which would justify the application of laches." We hold that the circuit court erred in ruling that Mr. Ambridge's claims were not barred by the doctrine of laches.

With respect to Mr. Ambridge's challenge under Article XI-A of the Maryland Constitution—namely, that the substance of the Charter Bill and the ballot question that followed constituted improper "charter material,"—the information that formed the basis for this claim was known or reasonably ascertainable through the exercise of diligence when the Charter Bill was enacted on March 12.

As discussed above, the State Board has no duty to certify the qualification of the ballot question for inclusion on the ballot and has no duty to draft or review the ballot question. Under state law, the question automatically qualified for inclusion on the ballot

43

when the City Council passed the Charter Bill. When the City Council enacted the Charter Bill in March and it was approved for "form and legal sufficiency" by the City Law Department on March 12, Mr. Ambridge and any other registered voter were on notice— i.e., had knowledge or means of knowledge—of any potential claim concerning the constitutionality of the substance of the proposed charter amendment. The City's legislative enactments are available to the public immediately and are posted on the City's website.[26] Moreover, it is undisputed that Mr. Ambridge had actual notice of the bill no later than April 19, when he personally contacted the City Law Department and requested an opportunity to review the ballot language and to suggest edits before the question was "sent to [the] State for Certification[.]" Notwithstanding the notice of any potential claim in March, Mr. Ambridge waited almost five months before filing his charter material claim.

Similarly, Mr. Ambridge acted with unreasonable delay in bringing his challenge to the wording or language of Question F. Mr. Ambridge's emails to the City Law Department on April 19 and July 16 undisputedly reflect that Mr. Ambridge—a former member of the City Council—had actual knowledge of the process, including that the City Law Department was required to draft the ballot language, and that the language was required to be certified by August 2. In both emails, he mentioned that with the passage of the Charter Bill, "[t]he Baltimore City Law Department is now required to provide language for the short title and narrative as it will be shown on the ballot, *and that [the]*

---

[26] Indeed, one can track a piece of legislation on the City's website from its introduction to its final enactment.

*language must be Certified by August 2, 2024*, by the State Board of Elections."[27]

(Emphasis added). In both emails, Mr. Ambridge requested an opportunity to review the

ballot language "*before it is sent to the State* for [c]ertification, and with ample time to

suggest changes to [the] same." (Emphasis added). Moreover, as of May 13, Mr.

Ambridge was on notice that the City Law Department would not permit any input

concerning the "content and drafting of the ballot question" before forwarding it to the

State Board. Thereafter, Mr. Ambridge did not request a copy of the ballot language

between August 2—the statutory deadline for the certification of the ballot question to the

---

[27] At oral argument, counsel for Mr. Ambridge pointed out that Mr. Ambridge was mistaken as to the actual certification date by the State Board. Although it is true that Mr. Ambridge mistakenly referenced the State Board as being the entity to certify the ballot language, he correctly referenced August 2—the deadline for the City Law Department to transmit the draft ballot language and the question's certification for qualification on the ballot to the State Board. Moreover, although the record reflects that Mr. Ambridge had actual knowledge of the process by which the City Law Department was required to draft the ballot language and send it to the State for certification, we reiterate that the party raising laches as a defense is not required to prove that the challenger had *actual knowledge*. Rather, the circumstances must reflect that the challenger had means of acquiring the knowledge of facts underlying the petition for judicial review. Given the petitioner's duty in election-related matters to stay informed and to exercise heightened diligence and promptness, it is incumbent on the petitioner to keep apprised of deadlines and to utilize all means reasonably within the petitioner's control to obtain the information that might form the basis of a judicial action. As this Court has explained, a plaintiff must have acted with reasonable diligence in seeking out information pertaining to the claim from any and all available sources, including: media reports (*see Ademiluyi v. Maryland State Bd. of Elections*, 458 Md. 1, 43 (2018); *Abrams v. Lamone*, 398 Md. 146, 159 n.18 (2007); *Ross*, 387 Md. at 667–71); the State Board's website (*see Abrams*, 398 Md. at 159 n.18); a Maryland Public Information Act request to the State Board (*see Ademiluyi v. Egbuonu*, 466 Md. 80, 129–30 (2019)); or the results of general research undertaken to uncover information, regardless of whether that information was published in media reports (*see Ademiluyi*, 458 Md. at 43; *Liddy v. Lamone*, 398 Md. 233, 239 n.9 (2007)).

45

State Board—and September 5—the date on which the petition was filed.[28]  We determine that Mr. Ambridge's action in failing to ascertain the contents of the ballot question for nearly one month between the ballot question's certification to the State Board on August 2 and the State Board's certification and public display of the entire ballot on September 3 constituted an unreasonable delay.

### 2.  *The Delay Caused Prejudice to the State Board, the City, and the Electorate*

Mr. Ambridge's unreasonable delay in filing the petition for judicial review caused prejudice to the State Board, the City, and the Baltimore City voters.  By waiting until after the State Board certified the ballot to assert claims related to Question F, Mr. Ambridge interjected chaos and uncertainty into the election process in Baltimore City.  Mr. Ambridge filed his petition on September 5, followed by an amended petition, and a second amended petition on September 9.  Even with expedited judicial review, the circuit court did not issue its memorandum opinion until September 18.  By that date, to ensure compliance with state and federal deadlines, mail-in ballots had already been printed.  The circuit court recognized the difficulty presented by its ruling and acknowledged that the

---

[28] In connection with its memorandum to the circuit court, the State Board attached an affidavit from Melissia Dorsey, an Assistant Deputy for Election Policy with the State Board.  She stated that her job duties include "overseeing coordination of responses to public requests for records."  She stated under oath that "[i]n the normal course of business where the response to an information request affects an election critical deadline such as ballot production, [the State Board] would have responded to a request for the Baltimore City Solicitor's letter that certified a ballot question within 48 hours by providing that letter to the requestor."  There is no evidence in the record that Mr. Ambridge requested the ballot language from the State Board after its certification and transmission of the ballot question on August 2.

State Board "would suffer an undue prejudice" if it were required to reprint 500,000 mail-in ballots to remove Question F from the ballot. Mr. Ambridge's delay caused ballots to be printed that included a ballot question that a circuit court had ruled was unconstitutional and not readable or understandable. Had Mr. Ambridge filed his challenges in a timely manner, these claims could have been addressed before ballot printing and mailing were well underway. Instead, voters received mail-in ballots containing a ballot question that a circuit court had ruled would not be counted[29]—a ruling that had generated considerable publicity and news coverage. The circuit court's order in this case exemplifies the very type of chaos that is engendered by permitting litigants to assert stale claims after ballot printing has commenced without properly considering the prejudice to the electorate or the election process. When a voter receives a ballot containing a question that a court has predetermined will not be counted, such judicial action may sow seeds of distrust in the system and may "call into question the value and the quality of our entire elections process[.]" *Liddy*, 398 Md. at 255. When presented with a question concerning the application of the doctrine of laches in the election context, the circuit court must consider not only any potential prejudice to the parties, but whether the delay causes prejudice to

---

[29] Although the City was not a party to the judicial review proceeding, the circuit court's memorandum stated that the "Baltimore City Board of Elections shall not certify the results of Ballot Question 'F' arising from the 2024 General Election for the City of Baltimore." Clearly, in a case involving judicial review of a ballot question arising by a legislative enactment in Baltimore City and drafted by the City Department of Law, the City should have been a party to and participated in the proceeding.

the electoral process.  Here, we hold that both of Mr. Ambridge's claims under § 12-202 were barred by the doctrine of laches.

### C. *Applying this Court's Well-Established Policy to Decide Constitutional Issues Only When Necessary, We Decline to Decide Whether the "Charter Material" Framework Applies to Legislatively Enacted Charter Amendments*

We turn next to the circuit court's ruling that Question F was "not proper charter material" under this Court's decision in *Cheeks v. Cedlair Corp.*, 287 Md. 595 (1980), and its progeny, and it therefore violated Article XI-A, § 3 of the Maryland Constitution.[30]  The circuit court determined that the charter amendment proposed in Question F was a "final rezoning scheme of legislative character[,]" and would leave "little, if any, discretion to Baltimore City's legislature to exercise its legislative authority[.]"  The circuit court also determined that Question F did "not touch the fundamental character of 'form and structure' of government as is properly reserved for charter amendments proposed to the electorate[.]"  The court concluded that "by proposing a final rezoning scheme of legislative character of Inner Harbor Park directly to the electorate of Baltimore City, the

---

[30] Article XI-A, § 3 provides that any charter adopted under Article XI-A, § 1 "shall provide for an elective legislative body in which shall be vested the law-making power of said City or County."  This section also provides that, in the City of Baltimore, the lawmaking power shall be vested in the City Council of the City of Baltimore, and that after the adoption of a charter by the City, the Mayor of Baltimore and the Baltimore City Council

> subject to the Constitution and Public General Laws of this State, shall have full power to enact local laws . . . including the power to repeal or amend local laws of said City . . . enacted by the General Assembly, upon matters covered by the express powers granted as above provided[.]

Article XI-A, § 3.

proposed charter amendment contravenes the Maryland Constitution and established Maryland Supreme Court precedent and is therefore unconstitutional." Before we address the parties' contentions here—and why we are declining to address this issue—a little background is helpful.

As noted above, Article XI-A, § 5 of the Maryland Constitution permits amendments to the Charter of Baltimore City by either of two methods: (1) by a resolution adopted by the Mayor and City Council; or (2) by a citizen-initiated petition. In *Cheeks*, this Court was asked to consider whether a citizen-initiated proposal to amend the Baltimore City Charter violated Article XI-A of the Constitution of Maryland. 287 Md. at 597. In that context, we held that an amendment that created a complete program for adopting and enforcing rent controls violated Article XI-A §§ 2, 3, 5, and 6 because it allowed voters to circumvent the legislative process and exercise the City's police powers. *Id.* at 610. We held that such charter amendments are limited to appropriate "charter material"—that is, matters affecting "the form or structure of government." *Id.* at 608.

In the aftermath of *Cheeks*, we applied the "charter material" framework in cases involving citizen-initiated petitions for charter amendments to determine whether the citizens' petition affected the "form and structure of government," or instead, was an attempt by the citizens to "circumvent the local legislative body and enact local law." *Griffith v. Wakefield*, 298 Md. 381, 384–90 (1984); *Save Our Streets v. Mitchell*, 357 Md. 237, 249–55 (1998); *Bd. of Supervisors of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220, 237–41 (1990). We also applied the "charter material" framework in one

49

case involving a legislatively initiated charter amendment, assuming for the sake of argument that the framework applied in that context. *Atkinson v. Anne Arundel County*, 428 Md. 723, 745–50 (2012).

In this case, the City asserts that the "charter material" framework articulated in *Cheeks* has no application where the charter amendment is initiated by the legislative body as opposed to a citizen-initiated petition. The City asserts that the constitutional underpinning of the "charter material" analysis is absent when an elected legislative body initiates and adopts legislation to present the question of a proposed charter amendment to its voters.

In contrast, Mr. Ambridge argues that the "charter material framework" applies here. Mr. Ambridge asserts that drawing a distinction between charter amendments sponsored by the legislative body as opposed to the electorate "has no roots" in the structure or language of the Maryland Constitution, nor in our jurisprudence that forms the basis of limiting charter amendments to "form and structure" changes to local government.

MCB asserts that, given the application of the doctrine of laches, as well as the doctrine of constitutional avoidance, this Court should not reach the issue in this case. We agree with MCB.

"It is this Court's well-established policy to decide constitutional issues only when necessary[.]" *Blake v. State*, 485 Md. 265, 305 (2023) (quotations omitted) (collecting cases). "Even if a constitutional issue is properly raised and decided at the trial level, this

50

Court will not reach the constitutional issue if it is unnecessary to do so." *Id.* (quotations

omitted). In keeping with this practice, we shall save this important issue for another day.[31]

### D. The Ballot Language Did Not Violate Our Case Law

Finally, the City and MCB argue that the circuit court erred in determining that the

ballot language does not pass the understandability standard articulated by this Court in

*Stop Slots Md. 2008 v. State Board of Elections*, 424 Md. 163 (1993).[32] Mr. Ambridge

asserts that the circuit court did not err because Question F was indecipherable and could

confuse and mislead voters. Mr. Ambridge contends that the metes and bounds verbiage

was unnecessary. To support its assertions, Mr. Ambridge directs us to the language of the

---

[31] We acknowledge that the per curiam order that we entered on October 10, 2024—the day after oral argument—reflects a holding that "Ballot Question F is not improper charter material." With the benefit of additional reflection and in light of the doctrine of constitutional avoidance, we deem it unnecessary to reach this issue and excise that holding from our consideration of that matter. Nothing in the per curiam order or this opinion should be construed as this Court addressing the open question of whether the "charter material" framework that this Court established in *Cheeks v. Cedlair Corp.*, 287 Md. 595, 608 (1980), applies to legislatively enacted charter amendments.

[32] Although we could decline to consider Mr. Ambridge's substantive claim on the understandability of the ballot language given our laches holding in the same manner as we have declined to consider the challenge to Question F's subject matter, we shall decide this issue for two reasons. First, this question does not involve a constitutional issue and the doctrine of constitutional avoidance has no bearing on our consideration of this issue. Second, given the importance of election-related matters, we determine that it is important to address Mr. Ambridge's substantive claim in the same manner that we sometimes do when confronted with an election challenge that is sometimes barred by laches. *See, e.g.*, *Lamone v. Schlakman*, 451 Md. 468, 473–74, 490 (2017) ("Although we conclude that Appellees' circuit court challenge to the [Baltimore City Board of Elections' and State Board of Elections'] actions is barred as untimely and foreclosed by the operation of laches, we also conclude, in the alternative, that their entitlement to the relief they sought fails because Appellees cannot succeed on the merits.").

2016 amendment to this very charter provision, which he contends is an example of how the charter amendment should have been drafted.

As previously discussed, EL § 7-103(b) contains the requirements for the text of a ballot question drafted by the City Law Department in connection with a charter amendment ballot question: "(1) a question number or letter as determined under subsection (d) of this section; (2) a brief designation of the type or source of the question; (3) a brief descriptive title in boldface type; (4) a condensed statement of the purpose of the question; and (5) the voting choices that the voter has."

In *Stop Slots*, this Court summarized our jurisprudence establishing the requirements for the understandability of ballot question language that is drafted pursuant to the requirements of § 7-103:

> [T]he Constitutional provisions providing for voter input by amendment or referendum, as implemented by the Election Law, require "a clear, unambiguous and understandable statement of the full and complete nature of the issues undertaken to be included in the proposition," *Anne Arundel County v. McDonough*, 277 Md. 271, 300 (1976), and that "the contents and purpose of the proposed referendum" or Constitutional amendment be set forth, in understandable language, "with that clarity and objectivity required to permit an average voter, in a meaningful manner, to exercise an intelligent choice." In evaluating the sufficiency of ballot language, we have stated that § 7-103 requires that "[t]he ballot . . . be complete enough to convey an intelligent idea of the scope and import of the amendment . . . [and] ought not to be clouded by undue detail . . . [or] misleading tendency, whether of amplification, or omission." *McDonough*, 277 Md. at 301–02.

424 Md. at 189–91 (cleaned up). We further explained that where "the ballot question is a summary of the purpose of the proposed amendment prepared pursuant to § 7-103(c), rather than the legislative title, as may be specifically prescribed by the General Assembly"

52

pursuant to § 7-105(b)(3), "the standard by which the question's validity will be judged is whether the question posed, accurately and in a non-misleading manner, apprises the voters of the true nature of the legislation upon which they are voting." *Id.* at 191–92 (cleaned up) (quoting *Kelly v. Vote Know Coal. of Md., Inc.*, 331 Md. 164, 172 (1993)) (quoting *McDonough*, 277 Md. at 296).

We have also made clear that judicial review of the ballot language is "not concerned with the question of whether this Court, the trial court, or any of the numerous advocates on either side of this issue, are capable of drafting better ballot language." *Kelly*, 331 Md. at 174. Indeed, we agreed with the Colorado Supreme Court that "[i]t is not the function of this court to rephrase the language of the summary and title to achieve the best possible statement of the intent of the amendment. If the chosen language fairly summarizes the intent and the meaning of the proposed amendment, without arguing for or against its adoption, it is sufficient." *Id.* at 174–75 (quoting *In re Proposed Const. Amend. Under Designation "Pregnancy,"* 757 P.2d 132, 137 (Colo. 1988)). Judicial review "is limited to discerning whether the language certified conveys with reasonable clarity the actual scope and effect of the measure." *Stop Slots*, 424 Md. at 204 (cleaned up) (quoting *Kelly*, 331 Md. at 174) (quoting *Surratt v. Prince George's County*, 320 Md. 439, 447 (1990)).

In undertaking our review of the language contained in Question F, the City directs us to the text of the underlying charter provision, set forth in Article I, which reads as follows:

53

## § 9. Inner Harbor Park.

There is hereby dedicated to public park uses for the benefit of this and future generations of the City of Baltimore and the State of Maryland the portion of the City that lies along the north, west and south shores of the Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge and north of Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor to and including Rash Field, except that, in order to provide eating places and other commercial uses, areas totalling not more than 3.2 acres plus access thereto, within the dedicated space and north of an easterly extension of the south side of Conway Street shall be set aside for such purposes; and except that in order to provide outdoor eating places for the areas known as West Shore Park and Rash Field, areas totalling not more than 0.5 acres within the dedicated space and south of an easterly extension of the south side of Conway Street shall be set aside for such purposes; and except that an area of not more than 3.4 acres shall be set aside for use by the Maryland Science Center, plus access thereto.

The City points out that the precise area dedicated for "public park uses" is defined using a metes and bounds description. From that dedicated area, the City notes that the charter language excepts or carves out "for eating places and other commercial uses" "areas totalling not more than 3.2 acres plus access thereto, within the dedicated space and north of an easterly extension of the south side of Conway Street[.]" The City explains that this language authorized the development of the pavilions (containing restaurants and shops) in the Inner Harbor Park but limited their location to the portion of the park to the north of Conway Street (the road that connects Camden Yards to the Inner Harbor). The City further points out that this language, which limits how the City can use and develop this area, has been in the charter for more than four decades.

Thus, according to the City, when the City Council decided to propose an amendment to this charter section that would: (1) increase the area that is excluded from

the "dedicated public park area" by 1.3 acres; and (2) allow two additional uses in the excluded areas (namely, multi-family dwellings and off-street parking)—but otherwise leave the remaining charter provisions unchanged—the City Council used the same language that had been in the charter for decades, describing what was already there and what is familiar to the voters of Baltimore City.

The City also directs us to the purpose paragraph of the Charter Bill, which used the same metes and bounds description that is contained in the existing charter section:

> FOR the *purpose of amending the provision dedicating for public park uses* the portion of the City that lies along the north west and south shores of the Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge, and north of Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor and including Rash Field *to permit multifamily residential development of off-street parking within the dedicated boundaries of Inner Harbor Park, but making clear that areas used for multi-family dwellings and off-street parking are not part of the area dedicated as park land for public benefit*; and submitting this amendment to the qualified voters of the City for adoption or rejection.

(Emphasis added).

The City asserts that the City Law Department then took this proposed amendment, with its statutorily designated purpose, and formulated language to express to the voters of Baltimore City exactly what the amendment would do if adopted, in order to allow the voters to exercise an intelligent choice, and used the same language from the charter provision so that the proposed changes could be put before the public in as neutral and accurate a form as possible.

55

Turning to the text, Question F's language read as follows:

QUESTION F
CHARTER AMENDMENT
**INNER HARBOR PARK**

Question F is for the purpose of amending the provision dedicating for public park uses the portion of the city that lies along the Northwest and South Shores of the Inner Harbor, south of Pratt Street to the water's edge, east of Light Street to the water's edge, and north of the Key Highway to the water's edge, from the World Trade Center around the shoreline of the Inner Harbor including Rash Field with a maximum of 4.5 acres north of an easterly extension of the south side of Conway Street plus access thereto to be used for eating places, commercial uses, multifamily residential development and off-street parking with the areas used for multifamily dwellings and off-street parking as excluded from the area dedicated as a public park or for public benefit.

Mr. Ambridge argued (and the circuit court agreed) that using the descriptive language of metes and bounds was "unnecessary verbiage." Indeed, the circuit court pointed out that the ballot question that was prepared for the 2016 proposed charter amendment is illustrative of an easily understandable ballot question regarding the very same section of the Baltimore City Charter. It read:

Resolution No. 16-29 is for the purpose of amending the Baltimore City Charter to expand the area within the Inner Harbor Park in which outdoor eating places can be located to include areas known as West Shore Park and Rash Field.

To be sure, we agree with Mr. Ambridge and the circuit court that the charter amendment could have been drafted better or written more clearly. However, as we have already noted, we are "not concerned with the question of whether this Court, the trial court, or any of the numerous advocates on either side of this issue, are capable of drafting better ballot language." *Kelly*, 331 Md. at 174.

56

Although we agree that the charter amendment (and the existing charter provision itself) could be drafted better or written more clearly, we determine that the language "convey[ed] with reasonable clarity the actual scope and effect of the measure." *Stop Slots*, 424 Md. at 204 (quoting *Kelly*, 331 Md. at 174) (quoting *Surratt v. Price George's County*, 320 Md. 439, 447 (1990). The City's ballot language (1) used the charter language to describe the area of the park, (2) set forth the proposed changes—that the charter provision be amended "with a maximum of 4.5 acres" north of Conway Street, "plus access thereto to be used for eating places, commercial uses, multifamily residential development and off-street parking[,]" and (3) stated that the areas used for multi-family dwellings would be "excluded from the area dedicated as a public park or for public benefit." We conclude that this language conveyed, with the minimum "reasonable clarity" required, the actual scope and effect of the measure.[33]

---

[33] Although we determine that the ballot language here satisfied the minimum threshold under the particular circumstances, it should not be viewed as a model for future drafting. Ballot language in future cases will need to be judged in view of the particular circumstances involved.

# V

## Conclusion

In conclusion, we hold as follows:

1.     EL § 9-209(a) is not a proper mechanism to challenge either whether a proposed charter amendment is proper charter material or whether ballot question language for a proposed charter amendment comports with Maryland law.

2.     Mr. Ambridge's claims under § 12-202 were barred by laches.  With respect to the claim that Question F was improper charter material, the City Council passed the Charter Bill in March 2024.  At that point, Mr. Ambridge and any other aggrieved person had knowledge or means of knowledge that the subject matter of Question F would be placed on the ballot.  Indeed, the undisputed record shows that Mr. Ambridge had actual knowledge of the subject matter no later than April 9.  As for the claim that the ballot language lacked sufficient clarity, the City Law Department was required by state law to certify the ballot language to the State Board by August 2.  Once again, Mr. Ambridge and any other aggrieved person had the means of acquiring knowledge of the ballot's language from the State Board by August 2.  Mr. Ambridge waited to file this action until the eve of the election, almost five months after the charter amendment question could have been raised and four weeks after his challenge to the readability of the ballot question's language could have been raised.  The unreasonable delay in filing the petition for judicial review caused prejudice not only to the State Board and the City, but, perhaps most importantly, to the Baltimore City electorate.

3.　　　The ballot question language comprising Question F conveyed, with the minimum reasonable clarity required, the actual scope and effect of the measure to permit an average voter, in a meaningful manner, to exercise an intelligent choice in voting for or against Question F.

For these reasons, we reversed the order issued by the Circuit Court for Anne Arundel County on September 17, 2024, and remanded the case to the circuit court for a judgment in favor of the Appellants.